**Not for Publication is West's Federal Reporter**
**Citation is Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 01-1039

UNITED STATES,

Appellee,

v.

JEFFREY NORTH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

Jeffrey North on brief pro se.
Michael J. Sullivan, United States Attorney, Christopher F. Bator, Assistant United States Attorney, and Elizabeth D. Collery, Attorney, Appellate Section, on brief for appellee.

January 22, 2004

**Per Curiam**.  Jeffrey North appeals his conviction and forty-five year sentence for drug trafficking and weapons violations.  We affirm.

The indictment charged North with one count of conspiracy to possess with intent to distribute large quantities of marijuana, two counts of illegal possession of weapons, and one count of illegal "use and carry" of weapons in relation to the charged drug conspiracy.  North's co-defendant, Regina Monaghan, was jointly charged in the drug conspiracy and, in a separate count, also charged with money laundering.

At the close of a seventeen-day joint jury trial, Monaghan was acquitted.  North was convicted of all the charges against him.  He was sentenced to a term of imprisonment of forty-five years.

The evidence against North included the testimony of three witnesses who each headed his own (separate) drug distribution ring:  Starita, Stevens and Petraglia.  Petraglia initially had assisted Stevens, becoming a separate supplier to North when Stevens left town.  Each supplier-witness testified in detail that on multiple occasions he supplied to North very large (wholesale) quantities of marijuana in exchange for North's payment of large amounts of cash.  During each transaction, North re-wrapped the drugs that he purchased in a unique fashion in the supplier's presence.  Each supplier also testified that North

carried, displayed and/or brandished various firearms during the transactions. The suppliers' testimony was corroborated by other witnesses who had played lesser roles in the deals, including Adams (who assisted in transactions with both Stevens and Petraglia), Rosa (who helped Stevens), and Butler (who was North's driver and who witnessed, inter alia, North's purchase of weapons and his resale of drugs).

North's connection to the weapons identified by the suppliers also was corroborated by the testimony of one Regan. Regan testified that he and other members of the "DeCologero gang" had stolen firearms from North's apartment, including the machine gun, silencer, UZI and ammunition charged to North in the indictment. The robbers had stashed some of the stolen weapons in the apartment of a young woman, Aislin Silva. A search of Aislin Silva's apartment by the ATF in November 1996, revealed the guns, which were duly seized. Others of North's weapons apparently ended up in a marsh where they were found in February 1997.

North testified in his own defense, denying almost every one of the government witnesses' incriminating allegations. In turn, North accused his accusers of engaging in a perjurious effort to frame him for their own drug dealing and falsely to attribute to him control or possession of weapons that the accusers had used in connection with their own drug activities.

Other incriminating physical evidence found by the police among North's possessions, North said, actually belonged to the government witnesses. Still, North admitted that he was acquainted with all of the drug-dealer witnesses (testifying that he worked as a pet/house-sitter for Stevens); that he had illegally purchased other drugs (steroids for personal use); and that he had participated in at least one theft of money from one of the drug suppliers.

North's testimonial protestations of innocence were severely impeached on cross-examination by proof of his own inconsistent out-of-court admissions in (1) tape-recorded telephone calls that he made from state prison to government witnesses, and (2) a statement that he made in a proffer session after his arrest. In an effort to blunt the impeaching effect, North asserted at trial that his taped telephonic comments did not mean what they seemed to mean, and that the pretrial statement he had proffered to the government was filled with lies.

North was represented by counsel at trial. In mid-trial, he moved for permission to proceed pro se. That motion was denied. After the trial, he was permitted to represent himself at sentencing, although the court also appointed standby counsel for him.

On appeal, North initially chose to proceed pro se. He then changed his mind and moved for appointment of counsel. That motion was granted. He then reversed field once again, and insisted upon appearing pro se. He persisted in that position notwithstanding this court's stern warning about the difficulties he likely would face if he chose to proceed without counsel on appeal. We ultimately granted his renewed motion to appear pro se.

North's brief presents ten labeled points. Each point includes a number of sub-points. Almost all of the issues are vaguely or imprecisely framed. In light of his pro se status, we interpret his arguments liberally, gleaning, by subject, the following sets of issues.

## I. THE CONSPIRACY CHARGE

North argues that there were a number of variances between the evidence adduced at trial and the conspiracy charged in Count Three of the superseding indictment. As a result, he urges that there was insufficient evidence to support his conviction on Counts Three and Four. Count Three charges:

> From in or about March, 1996 to in or about February, 1999, at Stoneham, Tewksbury, Melrose and elsewhere in the District of Massachusetts, and elsewhere . . . . Jeffrey North and Regina Monaghan. . . . defendants herein, did knowingly and intentionally combine, conspire, confederate and agree with each other, and with other persons known and unknown to the Grand Jury, to possess with intent to distribute marijuana. . . . in

-5-

violation of Title 21, United States Code, Section 841(a)(1) . . . . [and] Section 846.

Count Four is dependent on Count Three. Count Four charges that North "used" and "carried" specifically identified weapons "during and in relation to the drug trafficking crime alleged in Count Three . . ."

## A.   "Single" vs. "Multiple" Conspiracies

Below, all parties agreed that Count Three charged a "single" conspiracy. The defense objected that the government's evidence varied from the charge by instead indicating at least two separate conspiracies between North and his competing supply sources: one conspiracy between North and the distribution ring of Stevens/Adams/Rosa (and possibly Petraglia), and the other conspiracy exclusively between North and Starita.[1] There was no interdependence among the competing sources, nor proof even of an awareness of the other suppliers by Starita, according to the defense. In opposition, the government contended that the

_____

[1]The defense also argued, and North echos here, that the one and only conspiracy properly noticed was the Stevens/Adams/Rosa/Petraglia conspiracy since Starita's testimony had been insufficiently noticed. As framed, the argument implicates both Count Three and Count Four (as the proof that North had "used and carried" some of the weapons identified in Count Four had come largely from Starita's testimony about guns brandished during the Starita/North transactions). This argument is belied by the record. While Starita's name initially was omitted from a bill of particulars that named the other conspirators, notice of Starita's testimony was given approximately two and one-half weeks before the start of trial. The timing and manner of the notice was not shown to have caused any separate prejudice to the defense.

evidence proved that North was the "hub" of a single conspiracy to acquire marijuana from multiple sources of supply. These sources necessarily substituted for or supplemented one another from North's point of view.

The court correctly submitted this issue to the jury. The court charged -- as to each defendant -- that the jury should determine whether the evidence showed one "overall" conspiracy or separate conspiracies, and "if you believe the evidence shows that either defendant was a member of a conspiracy different from the one charged in the indictment, then you must find him or her not guilty. . . "

As raised on appeal, North's attack poses three sub-questions:

> (1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so, does the variance affect the defendants substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to "harmless error?"

United States v. Glenn, 828 F.2d 855, 857-58 (1st Cir. 1987); see also United States v. Sutherland, 929 F.2d 765, 772 (1st Cir. 1991).

**(1)  Sufficiency of the evidence**.  We review the sufficiency of the evidence to prove the charged "single"

conspiracy in the light most favorable to the verdict.  United States v. Wihbey, 75 F.3d 761, 774 (1st Cir. 1996).  Courts usually look for proof of factors such as (1) a "common goal," (2) interdependence among the participants, and (3) overlap among participants.  United States v. Portela, 167 F.3d 687, 694 (1st Cir. 1999); cf. United States v. Shea, 211 F.3d 658, 665 (1st Cir. 2000) (observing that "no magic formula exists for determining when a set of jointly committed crimes adds up to an overarching conspiracy or enterprise," but courts "tend to look" for the listed factors).

The evidence is overwhelmingly sufficient to prove, as the prosecution urged, that North was the hub of an enterprise that obtained drugs from multiple drug supplier-spokes.  All participants thus had as a "common goal" an interest in selling marijuana for a profit.  See Portela, 167 F.3d at 694 (reasoning "that each defendant had an interest in furthering the distribution of [drugs] is also sufficient evidence that they shared a common goal with the other participants").  Proof of North's own "pervasive involvement" as the "single core conspirator" also sufficed to show an "overlap" among the participants.  Id. at 695.  There also was ample proof to imply an "interdependence" among the participants.

**(2)  Similar Conspiracies**.  Even if the evidence is viewed as proving more than one conspiracy, each of them would fit

-8-

within the indictment's charge -- and each was sufficiently proven.

There was overwhelming proof of a pattern of large quantity sales between North and each of his supply sources, sufficient to permit a jury to find an implicit, if not explicit, agreement that each supplier would be a continuing source of supply for North's resale efforts. See United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993) (explaining that a continuing course of dealing between buyer and seller suggests the shared purpose, knowledge and interdependence necessary to prove a conspiracy between them). And, viewing each source as a participant in a separate conspiracy, each conspiracy would fit within the description in the indictment: that from March 1996 to February 1999, North conspired with persons "known and unknown" to "possess with intent to distribute marijuana."

**(3) Substantial Rights**. In all events, the alleged variance through proof of more than one conspiracy did not affect North's substantial rights. We review this issue de novo, see Wihbey, 75 F.3d at 774, and discern no prejudice from the purported variance.

The defense had notice of the government's case sufficient to avoid any surprise at trial. There was no danger of a prejudicial spillover effect since the evidence was sufficient to prove a conspiracy between North and each of the

suppliers. There is no reason to suspect any ensuing confusion about the scope of the judgment, which runs solely against North.

As to Count Four, since each of North's allegedly separate agreements within the confines of the Count Three charge, there also was no lack of proof that North "used and carried" each of the weapons identified in Count Four "during and in relation to the drug trafficking crime alleged in Count Three."

## B. __Vagueness of the Indictment__

North argues for the first time on appeal that the Count Three conspiracy charge is impermissibly vague. He suggests that an overall lack of specificity, as well as some specific omissions,[2] may have prejudiced him by giving insufficient notice "of what he must be prepared to meet," and allowing the prosecution to "guess" at the facts upon which the grand jury had relied. As a result, he urges, he was deprived of his right to be tried only on charges presented to the grand jury.

North does not point to any actual prejudice, but draws upon general principles culled from a number of factually distinguishable cases, including Russell v. United States, 369 U.S. 749, 763-70 (1962). However, the facts of each case and the

_____

[2]North essentially backs into this point, arguing that the charge is impermissibly vague unless it is construed to charge a conspiracy solely between North and Monaghan. Construing the indictment as written, to include a conspiracy with unnamed others and without specification of an overt act, he argues, renders it too uncertain.

-10-

particular crime charged necessarily inform any evaluation of the fairness of notice of the conduct charged by the grand jury. Tomasetta, 429 F.2d 978, 979 (1st Cir. 1970). The test is "not whether in hindsight the indictment or information could have been more complete. . . but rather whether it fairly identifies and describes the offense." United States v. Allard, 864 F.2d 248, 250 (1st Cir. 1989).

A perfect alignment between the indictment's charge and the offense conduct of conviction is not required. Where the defendant is convicted of narrower conduct than that charged in the indictment, there is no violation of the Fifth Amendment as long as the trial proof corresponds to an offense which was clearly set out in the indictment. United States v. Miller, 471 U.S. 130, 136 (1985).

Here, the indictment clearly charged that North conspired with Monaghan and "known and unknown" other persons to possess and distribute large quantities of marijuana in and around identified cities and towns in Massachusetts during a specified two-year period. The trial proof conformed to the indictment by showing that North in fact conspired with a number of persons to buy and sell large quantities of marijuana on many occasions in the relevant time period, in and around the named places. The offense proved, as in Miller, was thus fully contained in the indictment, and no additional crime was added. Id. at 137-38,

-11-

143.  And North has not shown that the indictment's wording (as supplemented in the bill of particulars and in pretrial discovery), in any way prejudiced his ability either to defend himself at trial or to use the judgment as a bar to subsequent prosecutions.  Id. at 138 n.5.

At any rate, any possible vagueness argument was waived by the failure to object on that ground at trial.  See United States v. Cotton, 535 U.S. 625, 631 (2002) (holding that, generally, defects in an indictment may be waived).  Accordingly, we apply a plain error standard of review.  Id.

That ends the matter.  Even if there were an error -- and we see none -- there is no reason to believe that it had any effect on North's substantial rights since he had ample actual notice of the government's case against him.  There is also no reason to doubt the fairness, integrity, or public reputation of the proceedings.  Here, as in Cotton, "the real threat to the fairness, integrity, and public reputation of the judicial proceedings would be if . . . despite the overwhelming and uncontroverted evidence that [defendant] was involved in a vast drug conspiracy," his conviction was reversed due to a non-prejudicial miswording of the indictment.  Id. at 634.

**Names of Co-conspirators**.  North also argues for the first time on appeal that the indictment is insufficient because it did not identify by name any co-conspirators other than

Monaghan. But there is no requirement that an indictment specify the names of co-conspirators. The only relevant question is whether, without the names, the defendant had sufficient notice of the charged offense to prepare a defense and to know whether there was reason to plead a former acquittal or conviction. United States v. Indorato, 628 F.2d 711, 717 (1st Cir. 1980).

North was given sufficient pretrial notice of the names and testimony of alleged co-conspirators to enable him to prepare a defense. There was and is no legitimate double jeopardy issue. Consequently, there was no prejudice -- and no plain error.

**Overt act**. North argues for the first time on appeal that the conspiracy count is insufficient because it fails to specify an overt act. Under 21 U.S.C. § 846, the federal crime of drug conspiracy is complete upon the making of an agreement. See United States v. Shabani, 513 U.S. 10, 15-16 (1994). The conspiratorial agreement itself is the "actus reus," so the government is "not required to plead or prove any overt act in furtherance of a section 846 conspiracy." United States v. Vega-Figueroa, 234 F.3d 744, 753 (1st Cir. 2000) (quoting United States v. Bello-Perez 977 F.2d 664, 669 (1st Cir. 1992)); cf. United States v. Nelson-Rodriguez, 319 F.3d 12, 28 (1st Cir. 2003) (noting that an agreement may be proved by circumstantial evidence). Thus, no plain error attended this omission.

### C.   Monaghan's Acquittal

Although North disclaims any argument for acquittal based on inconsistent verdicts, he argues that since Monaghan was acquitted of the conspiracy charge, he too must be acquitted. He offers several theories to bridge this gap.

First, North argues that Monaghan's acquittal requires that all references to her must be read out of the indictment, thus allegedly rendering the indictment insufficient for lack of specificity. As the government sensibly rejoins, the sufficiency of an indictment is not determined by hindsight but by whether it gave fair notice at the outset, stated all the elements of the offense, and enabled a plea of double jeopardy. As discussed above, the indictment passed this test.

Second, North argues that Monaghan's acquittal logically means that there was insufficient proof against him of the one conspiracy concretely noticed in the indictment, i.e., a North/Monaghan conspiracy. This tautology, too, must be rejected. In United States v. Bucuvalas, 909 F.2d 593 (1st Cir. 1990), we rejected a nearly identical argument, holding that the acquittal of the only other named co-conspirator did not mean that there existed no conspiracy between the two but might instead mean, among other possibilities, that the jury was disposed to lenity toward the other co-conspirator. Id. at 595. Lenity seems to be an especially plausible explanation for Monaghan's acquittal,

-14-

since the government's proof against Monaghan suggested that, by comparison to North, she played a very limited role.

The bottom line is that, despite North's creative interpretation of the indictment, it expressly charged a conspiracy that implicated other persons. Thus, even if we were to apply a rule requiring consistency, (i.e., requiring reversal of a conspirator's conviction when all other alleged co-conspirators have been acquitted), there is no perceived inconsistency "where the convicted defendant was alleged and shown to have conspired with one or more persons who were unapprehended, dead, or simply unknown, . . . [or where] any [other] coconspirator's case was disposed of other than on the merits." Id. at 595 n.3. North's conviction obviously fits into the latter category, so there was no inconsistency here.

In a third variation on this theme, North argues that the court's charge to the jury that each defendant's participation in the conspiracy should be separately determined amounted to a constructive amendment. In light of what we already have said, the instruction was correct. Upon de novo review of the jury instruction, we find that it was faithful to the indictment's charge and there was no constructive amendment.

_____

## II.  Alleged Evidentiary Errors

North also assigns as error the unobjected-to admission into evidence of several pieces of evidence.  We assess each claim of error separately.

### A.    The Murder of Aislin Silva.

Upon our own review, there was neither plain error nor prejudice to North in the admission into evidence of the scattered, oblique references to Silva's murder in lengthy tape recordings and in a few exhibits.  Indeed, the defense took advantage of the fact of the murder as a means of disparaging the credibility of at least one unfriendly witness, Regan, and any possibility of prejudice to North was dispelled by Regan's testimony on cross-examination that North was not involved in the murder.

### B. Alleged Perjury.

North asserts that the prosecution presented perjured testimony in violation of his right to due process when it permitted Starita to testify that he first met North in 1996. Impliedly, North urges that the  admission of the alleged perjury was "plain error."  He asserts that Starita's perjury is demonstrated by record evidence of an inconsistency between Starita's grand jury and trial testimony and by inconsistencies between Starita's trial testimony and facts recorded in a hearsay statement that was excluded from evidence.  Upon our own review,

we apprehend no proof in the record of any perjury, merely some attenuated or arguable inconsistencies among witnesses, and no error at all in the admission of Starita's testimony about the date.

## C. **Allegedly Coerced Confession**.

North impliedly urges plain error in the failure of the court to exclude his confession from evidence and/or to order a hearing into its voluntariness. North admitted on direct examination that he had made an inculpatory statement to government investigators during a pretrial proffer session, but he said that the statement was a lie. On cross-examination, he asserted that the statement had been elicited from him by the investigators through threats and the "torture" of his family members.

Upon our own review of the record, we see no meaningful indicia of coercion. North's conclusory accusations instead seem to be refuted by the circumstances surrounding the proffer session.[3] Accordingly, there was no plain error in the court's failure sua sponte to either notice this as an issue or to order a hearing on the voluntariness of the statement. See generally

---

[3]A government investigator testified that the proffer session was arranged to accommodate North's spontaneous request for the session. North was apparently represented by counsel at the time (or, at least, was given the opportunity to have counsel present.

United States v. Santiago Soto, 871 F.2d 200, 201-03 (1st Cir. 1989).

### III.  INEFFECTIVE ASSISTANCE CLAIMS

North has raised a number of claims of ineffective assistance by trial counsel.  We decline to address them on direct appeal.

"Although we have occasionally reviewed ineffective assistance claims on direct appeal, 'we travel this route only when the critical facts are not in dispute and the record is sufficiently developed to allow reasoned consideration of the claim." United States v. Benjamin, 252 F.3d 1, 12 (1st Cir. 2001) (quoting United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993)).  As we observed in Mala, "[w]e have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." Mala, 7 F.3d at 1063. North's fact-sensitive claims of ineffective assistance were not presented to the trial court for initial consideration as contemplated by 28 U.S.C. § 2255, and the record is insufficiently developed to permit reasoned appellate consideration under ordinary standards of appellate review.  That ends the matter.

## IV.  **DENIAL OF REQUEST TO PROCEED PRO SE**

We see no error in the denial of North's mid-trial request to proceed pro se.  On the eleventh day of the trial, North requested that his trial counsel's representation be permitted to continue only until the close of the prosecution's case so that, thereafter, North could present his case in defense pro se.  He explained that he wished to call and recall witnesses in order to pose questions and present theories with which his counsel disagreed.

The court held a hearing on the request and engaged North in a lengthy colloquy anent the evidence and theories that he wished to present.  The court also heard from North's counsel, counsel for co-defendant Monaghan, and the government.  The court then rejected North's request.

The controlling legal principles are clear:

> A district court has considerable discretion to grant or deny a request for self-representation that is not presented until trial is underway. . . But that discretion is not unbridled.  It is improper for the court to deny the defendant the right to serve as his own attorney solely because of a perceived lack of legal dexterity. . . Rather, in the last analysis the court must balance the legitimate interests of the defendant in self-representation against the potential disruption of the proceedings already in progress.

United States v. Noah, 130 F.3d 490, 498 (1st Cir. 1997) (citations and internal quotation marks omitted); cf. Faretta v. California, 422 U.S. 806, 834-36 (1975) (observing that a defendant has an absolute right to self-representation when the right is asserted in a timely manner prior to trial).

The trial judge's decision rejecting North's request expressly balanced a myriad of relevant factors including the complexity of the trial, the numerous delays and conferences that had already occurred, the likely further disruption that might be caused by granting the request, and the likely prejudice to the other parties. The court supportably found that the evidence that North wished to present on his own was remote, collateral and probably prejudicial to his own cause,[4] whereas his defense lawyers "are highly experienced and skilled, [and] have obviously devoted a great deal of time and effort" to the case. In these circumstances, the court concluded that permitting North to change course in order to represent himself mid-trial would cause an intolerable disruption of the orderly process of the trial -- a disruption that outweighed any legitimate interest he might have in self-representation. For the same reason, the court also properly refused a narrower request to permit North to make his own closing argument.

---

[4]Because this determination was unexceptionable, we also reject North's argument that he was deprived of his constitutional right to call witnesses in his own defense.

-20-

These rulings pass muster. As we said in similar circumstances:

> The reasonableness of this conclusion is scarcely open to question. District Courts have an institutional interest in avoiding the disruption of trial proceedings. To permit a defendant to switch roles near the halfway point of a complicated criminal trial runs an obvious risk of dislocating both the court's docket and the orderly progression on the trial. . . [and] . . . would have tended to prejudice the prosecution.

Noah, 130 F.3d at 498.

## V. SENTENCING

North argues that the court erred in several ways in computing his sentence for Counts One through Three (but he does not challenge his mandatory 30-year consecutive sentence on Count Four for use of a firearm during a drug trafficking crime). North was sentenced to a total of 180 months on these three counts, as follows:

(1) Concurrent terms of 120 months (the statutory maximum on each count) for the "groupable" weapons possession offenses in Counts One and Two.

(2) A consecutive term of 60 months for the drug conspiracy count (Count Three).[5]

---

[5]Although Count Three might have carried a higher sentence since more than 1000 kilograms had been noticed in the indictment

-21-

North asserts that two types of errors occurred. First, he accuses the court of computational mistakes under USSG § 5G1.2. These are figments of his imagination. The district court simply did <u>not</u> mis-compute the "total punishment" for the three counts in the ways that North claims. Rather, the court correctly computed North's adjusted combined offense level (34), and from that, in conjunction with North's criminal history category, correctly determined the guideline sentencing range (188-235).

Nor did the court err in its refusal to run all three sentences concurrently. Instead, having determined that the sentencing range was 188-235 months, and that none of the counts of conviction had a statutory maximum greater or equal to the total punishment, the court correctly followed the guidelines. "The Guidelines mandate the imposition of consecutive sentences in order to achieve (as close as possible) the 'total punishment.'" <u>United States</u> v. <u>Garcia-Torres</u>, 341 F.3d 61, 75 (1st Cir. 2003); <u>see also</u> USSG § 5G1.2(d).

North's other argument is that the court violated the rule in <u>Apprendi</u> by imposing a sentence in excess of 60 months.

and more than 1600 kilograms had been proven at trial, <u>see</u> 21 U.S.C. § 841(b)(1)(A)), the drug quantity issue had not been submitted to the jury. At sentencing, the government agreed that in light of the intervening decision in <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466, 490 (2000), North should receive only the default statutory maximum (60 months) on this count. This concession seems extremely generous, but the <u>Apprendi</u> issue is not before us.

The argument is hard to follow but seems to include an attack on the court's reliance upon the 1600+ kilos shown in evidence at trial to compute his base offense level. But Apprendi does not preclude a sentencing court from considering a fact that has not been submitted to the jury for purposes authorized by the sentencing guidelines -- so long as the sentence imposed does not exceed the applicable statutory maximum. See United States v. Caba, 241 F.3d 98, 100 (1st Cir. 2001). Moreover, Apprendi is not violated by the imposition of consecutive sentences to the extent necessary to achieve the prescribed total punishment under § 5G1.2 -- so long as the defendant does not receive greater than the statutorily prescribed maximum sentence on any particular count. United States v. Feola, 275 F.3d 216, 219 (2d Cir. 2001). "[T]he aggregate sentence is imposed because appellant has committed two offenses, not because a statutory maximum for any one offense has been exceeded." Id. at 220.

North makes other arguments that are hopelessly garbled, redundant, obviously unavailing, or otherwise not deserving of discussion. We reject them all.

For these reasons, the conviction and sentence are affirmed.