# United States Court of Appeals
## For the First Circuit

No. 04-1882

UNITED STATES OF AMERICA,

Appellee,

v.

JASON PACHECO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Stahl, Senior Circuit Judge.

Kimberly Homan for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

January 19, 2006

**SELYA**, **Circuit Judge**. This criminal appeal arises in an unorthodox procedural posture. The district court, after granting a midtrial "partial directed verdict" on a single-count indictment, sent the case to the jury. Once a guilty verdict had been returned, the court entered a judgment of conviction and vacated the partial directed verdict. The defendant objects to this sequence of events on both double jeopardy and due process grounds. Although we reject the defendant's double jeopardy claim, we nonetheless hold that his right to a fair trial was compromised. Accordingly, we vacate the judgment below and remand for a new trial on the original indictment.

## I. BACKGROUND

The evidence, viewed favorably to the government's theory of the case, would have allowed the jury to find that Rafael Yeje-Cabrera headed a mammoth drug-trafficking ring. The organization purveyed large quantities of cocaine and marijuana in and around southeastern Massachusetts. At some point, a lengthy federal investigation ensued. The probe reached a crescendo on December 8, 2001, when a tractor-trailer carrying 260 kilograms of cocaine accidentally backed into a state police cruiser. See United States v. Yeje-Cabrera, 430 F.3d 1, 5-6 (1st Cir. 2005) (outlining the contours of the overall investigation and describing the denouement).

The jury also could have found that defendant-appellant Jason Pacheco was a distributor for, and customer of, the organization. The government contended that he purchased cocaine from Yeje-Cabrera in increments up to one kilogram every few weeks for nearly two years and that he took part in other exchanges of money and drugs. During one incident highlighted by the government, a member of the drug ring "re-rocked" a kilogram of cocaine for the defendant and, acting at Yeje-Cabrera's direction, charged him a sharply discounted fee for this illicit service.

The evidence further showed that on December 13, 2001, a large cocaine transaction — involving all or some portion of a twenty-five kilogram cache — took place in the defendant's garage. Two cars arrived there around 5:30 p.m. The defendant indicated that he wanted the occupants "to leave right away," and he himself went outside several minutes later and began pacing between his house and the street. Yeje-Cabrera arrived about an hour afterwards and, around 7:00 p.m., everyone left. Officers stopped one of the departing cars and a search revealed $50,000 in cash hidden in a secret compartment. Although the officers discovered no cocaine, a drug dog alerted to one area of the car. When law enforcement agents later procured a warrant and searched the defendant's premises, they found a large sum of cash but no drugs.

## II. TRAVEL OF THE CASE

On December 20, 2001, a federal grand jury indicted twenty-one individuals. The indictment contained four counts. Pacheco was named only in count 1, which charged him and the others with "conspir[ing] . . . with each other and with persons known and unknown to the Grand Jury, to possess with intent to distribute, and to distribute, more than 5 kilograms of cocaine" in violation of 21 U.S.C. §§ 841 and 846.

All of those accused, save six, pleaded guilty. One of the intransigent six died during the early stages of the proceedings. The defendant and the four remaining accused persons opted for trial. Because the court granted a severance, see Fed. R. Crim. P. 14, the defendant stood trial alone.

After the close of the government's case in chief, which included the testimony of three cooperating witnesses who had themselves been named in the indictment, the defense took the position that the government had proved, at most, that the defendant was a member of a small, peripheral conspiracy (not the master Yeje-Cabrera conspiracy charged in the indictment). Accordingly, the defendant moved for a directed verdict on the ground that "there [was] a prejudicial variance between the conduct alleged in the indictment and the proof offered at trial." The district court sensibly deferred ruling on the motion until the close of all the evidence. See Fed. R. Crim. P. 29(a).

The defendant presented evidence and, after both sides had rested, the court purported to grant a partial directed verdict because, on the government's "best evidence," the prosecution had proved only that the defendant was part of a small "spoke" conspiracy, not part of the large "hub" conspiracy headed by Yeje-Cabrera. As a result, no "reasonably instructed jury could find . . . that he was in on a conspiracy to gain 260 kilograms" of cocaine. At the same time, the court denied the defendant's companion motion for a required finding of not guilty.

In its jury instructions, the district court did not mention its narrowing construction of the charge against the defendant but, rather, provided a generic conspiracy instruction and a special verdict slip requiring a finding on drug quantity. The defendant objected in vain to the mismatch between the instructions and the court's earlier ruling (but did not suggest the possibility of a double jeopardy violation). The jury found the defendant guilty of conspiracy to possess with intent to distribute more than five kilograms of cocaine.

The defendant seasonably moved for a new trial, see Fed. R. Crim. P. 33(a), claiming, insofar as is relevant here, that the district court's jury instructions did not "sufficiently distinguish the separate and particular conspiracy for which the defendant was charged from that of the overall 'Yeje-Cabrera' conspiracy." On August 5, 2003, the district court, with the

-5-

motion for a new trial still pending, sentenced the defendant to a twelve-year incarcerative term. The court stated that it would withhold the entry of judgment until it resolved the pending motion. Something went awry, however, and the clerk entered judgment on January 23, 2004. It was not until a month later that the court denied the new trial motion.

The defendant immediately moved for reconsideration. The district court granted that motion and vacated its earlier order denying the new trial motion. At that time, the court tentatively concluded that its so-called partial directed verdict had created a variance between the indictment and the proof. The court also stated its belief "that the [partial directed verdict] order was erroneously entered" because the court had overlooked the government's evidence of the incident that transpired in the defendant's garage. The court announced that it was considering whether it could "take . . . back" that erroneous order.

On June 18, 2004, the district court issued an omnibus opinion in which it resolved sundry issues concerning the defendant and certain of his alleged coconspirators (who had been tried separately). As to the defendant, the court concluded that the thought process underlying its partial directed verdict order introduced a fatal variance into the trial, which impaired the defendant's substantial rights. See United States v. Green, 346 F. Supp. 2d 259, 335-37 (D. Mass. 2004). However, the court then

ruled that the partial directed verdict was in error because the jury had before it evidence from which it reasonably could have found that the defendant was a member of the master Yeje-Cabrera conspiracy. See id. at 337-38. The court went on to determine that the jury had not been influenced by the erroneous ruling and that, in all events, the defendant had "waived any procedural argument that the Court [lacked the authority to] revisit the partial directed verdict order." Id. at 338. Consequently, the court vacated the so-called partial directed verdict, denied the defendant's motion for a new trial, and allowed the jury's verdict to stand. Id. This timely appeal followed.

## III. ANALYSIS

The defendant mounts several challenges to his conviction and sentence, most of which (including assignments of error relating to the admission of evidence and aspects of the sentencing process) we need not reach. The centerpiece of his appeal is a claim that the sequence of events described above — the lower court's granting of the so-called partial directed verdict, its subsequent submission of the case to the jury, and its eventual rescission of its original ruling after the entry of judgment — violated the Double Jeopardy Clause. His fallback position is that the jury verdict cannot stand because the district court transgressed due process by denying him "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S.

479, 485 (1984). To this, the defendant adds that the court constructively amended the indictment and/or created a material variance between the indictment and the proof, thus further prejudicing his rights. We first address the double jeopardy point and then turn to the fair trial issues.

## A. Double Jeopardy.

The Fifth Amendment declares that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause encompasses three general protections: "it shields a defendant from a second prosecution for the same offense after either conviction or acquittal, and it also prohibits multiple punishments for the same offense." United States v. Morris, 99 F.3d 476, 478 (1st Cir. 1996); see North Carolina v. Pearce, 395 U.S. 711, 717 (1969). In this instance, the defendant invokes the second protective branch; he claims that the district court's so-called partial directed verdict constituted an acquittal and that, therefore, the court unconstitutionally placed him in additional jeopardy both when it sent the case to the jury and when it vacated its earlier ruling after the entry of judgment.

When evaluating a double jeopardy claim, a reviewing court first must ask "whether jeopardy attached in the original [trial] court proceeding." Gonzalez v. Justices of the Mun. Ct., 382 F.3d 1, 8 (1st Cir. 2004) (Gonzalez I), vacated, 125 S. Ct.

-8-

1640 (2005) (mem.), reinstated, 420 F.3d 5 (1st Cir. 2005) (Gonzalez II). That query must be answered affirmatively here.

In a jury case, jeopardy attaches when the jury is empaneled and sworn. Serfass v. United States, 420 U.S. 377, 388 (1975). The district court entered its so-called partial directed verdict at the close of all the evidence, long after jeopardy had attached. But "the conclusion that jeopardy has attached begins, rather than ends, the inquiry." Illinois v. Somerville, 410 U.S. 458, 467 (1973). Thus, we must take a further step and ask "whether the [trial] court terminated jeopardy in a way that prevents reprosecution." Gonzalez I, 382 F.3d at 8. We conclude that the defendant's claim fails to satisfy this requirement because we cannot say that the district court's so-called partial directed verdict was, "in fact, a judgment of acquittal." Smith v. Massachusetts, 125 S. Ct. 1129, 1134 (2005). We explain briefly.

It is beyond cavil that, for double jeopardy purposes, the finality accorded to jury verdicts of acquittal extends equally to judicially rendered judgments of acquittal. See United States v. Martin Linen Supply Co., 430 U.S. 564, 573 (1977). Withal, the question of what constitutes a "judgment of acquittal" is not governed either by the form of the trial judge's ruling or by his characterization of it. See United States v. Scott, 437 U.S. 82, 96 (1978); Martin Linen, 430 U.S. at 571. Rather, a reviewing court "must determine whether the ruling of the judge, whatever its

label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." Martin Linen, 430 U.S. at 571; see Gonzalez II, 420 F.3d at 8-9. A resolution in the defendant's favor of a necessary factual element of the offense is a definitive determination that the defendant cannot be convicted.

Here, confusion clouds any attempt to decipher the so-called partial directed verdict. First, the directed verdict device has been alien to federal criminal procedure for over half a century. Its function was usurped by the introduction of a motion for judgment of acquittal. See Fed. R. Crim. P. 29 (adopted Dec. 26, 1944). This does not much concern us; the adopted rule represents a "change of nomenclature," not a modification of "the nature of the motion." Id. advisory committee's note (1944). Thus, one possible way to understand the district court's partial directed verdict would be as a mislabeled judgment of acquittal.

However, the anatomy of the indictment belies that understanding. The indictment charged the defendant in only a single count, yet the district court deemed its order "partial." It is surpassingly difficult to conceive, as a theoretical matter, of a judgment of acquittal on a one-count indictment that leaves a triable issue in its wake. If the order were to be read as a straightforward judgment of acquittal, there could be nothing "partial" about it.

In an effort to reconcile these anomalies, the parties offer two diametrically different characterizations of the partial directed verdict.  Neither explanation is convincing.

Relying on certain of the district court's statements at trial and its later characterizations of its actions, the defendant classifies the partial directed verdict as a ruling that "the government had not presented sufficient evidence to support a jury finding beyond a reasonable doubt that Pacheco was a member of the 'Cabrera conspiracy' charged [in the indictment]," and, therefore, as a complete resolution of the single count at issue.  We cannot accept this taxonomy.  The partial directed verdict did not reflect a complete acquittal as to the charged conspiracy for at least three reasons.  First, if that had been its purport, there is no earthly reason why it would have been denominated "partial." Second, the court, in that event, would not concurrently have denied the defendant's motion for a required finding of not guilty. And, finally, it would then have been pointless to send the case to the jury (as the district court did).

For its part, the government insists that the so-called partial directed verdict was simply "a way of limiting the quantity of cocaine attributable to Pacheco based on his . . . limited role within the Yeje-Cabrera conspiracy."  This view assumes that the court entered the order as a result of conflating the issue of guilt and the issue of drug quantity.  See Derman v. United States,

-11-

298 F.3d 34, 42-43 (1st Cir. 2002) ("[I]n a drug conspiracy case, the jury should determine . . . any facts about the conspiracy that will increase the possible penalty . . . beyond the default statutory maximum; and the judge should determine, at sentencing, the particulars regarding the involvement of each participant in the conspiracy." (footnote omitted)); see also Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). But we think it highly unlikely that a seasoned judge would confuse these matters, and the judge's reasoning when he made the ruling indicates that he had placed the Apprendi issues to one side.[1] In addition, the court's post-ruling statements, while not controlling, do not in any way indicate a relationship between the partial directed verdict and drug quantity per se. See Green, 346 F. Supp. 2d at 335-38.

To sum up, the partial directed verdict was less than a complete acquittal (the defendant's position) but more than a ruling on drug quantity (the government's position). The district court's action falls somewhere in between those polar extremes. Exactly where is hard to tell because the court's order has a protean quality.

On one hand, the order may be viewed as an attempt to grant a partial acquittal, notwithstanding the topography of the indictment and the court's subsequent actions (e.g., its wide-

---

[1] When making the partial directed verdict ruling, the court twice advised counsel to "[f]orget Apprendi for the moment."

ranging jury instructions).  On the other hand — and perhaps more plausibly — the order may be viewed as an evidentiary comment — a limitation on the scope of the conspiracy that the court would allow the jury to consider.  On that reading, the court may have been ruminating that the jury, if properly instructed, could not reasonably find that the defendant was a member of the larger "hub" conspiracy but could find that he was a member of the smaller "spoke" conspiracy.  Cf. United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995) (noting, as to a larger charged conspiracy and a smaller proven conspiracy, that "[s]o long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged — so long as the difference does not cause unfair prejudice").[2]

Given these rampant uncertainties, we are reluctant to say that the partial directed verdict — a shapeless, inherently ambiguous ruling made without any degree of formality — must be assumed to represent a resolution, correct or incorrect, of the offense charged rather than a provisional attempt — later abandoned

---

[2] We do not need to determine whether the difference between the "hub" conspiracy and the "spoke" conspiracy resulted in unfair prejudice.  We include a reference to the variance analysis here, however, to illustrate that the partial directed verdict plausibly can be viewed as a ruling that contemplated limiting jury instructions which, if properly given, might have cured any possible prejudice.  See, e.g., United States v. Tormos-Vega, 959 F.2d 1103, 1115-16 (1st Cir. 1992) (holding that, even if a variance did occur, it did not result in prejudice to the defendant because the court gave a curative jury instruction).

-13-

— to narrow the scope of the facts that the jury could find in deciding whether to convict on the offense charged. Certainly, no case cited by the defendant treats so fuzzy a ruling as an acquittal, and what guidance we can glean counsels caution in expanding our understanding of an acquittal for double jeopardy purposes to include such a curious ukase. Cf. Smith, 125 S. Ct. at 1136 (positing that the "tentative" nature of a midtrial sufficiency-of-the-evidence ruling would alter the double jeopardy calculus). To take a more aggressive view would make a double jeopardy defense available in any case in which a court succumbs to the urge to comment during trial about the sufficiency vel non of the evidence.

We add, moreover, that the core purposes of the Double Jeopardy Clause do not seem to be offended by a conservative approach to such inscrutable statements. Affording them a less-than-acquittal status does not arm the prosecution with an instrument of oppression, see Martin Linen, 430 U.S. at 569, but, rather, serves to promote clarity and formality when a court undertakes to make a ruling of intended significance. In our judgment, these characteristics — clarity and some degree of formality — are very desirable in situations like the one presented here; an inscrutable comment on evidentiary sufficiency in a single-count case that thereafter moves forward without any

consistent follow-up should not be enough to constitute an acquittal.

In all events, we need not answer the double jeopardy question definitively. Here, the defendant forfeited his double jeopardy claim by failing to raise it at the time the case was submitted to the jury. Under the defendant's reasoning, predicated on his understanding that the partial directed verdict was a full acquittal, any double jeopardy violation would have matured by that time and should have been readily apparent. Even if the defendant viewed the partial directed verdict only as an acquittal on the "hub" conspiracy charge, the court's submission of that charge to the jury would have been foreclosed (and, therefore, should have prompted an objection based on double jeopardy). In either case, a double jeopardy claim should have been interposed while the trial court had an opportunity either to clarify the situation or to take corrective action. See, e.g., United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995) ("[C]alling a looming error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs."). Because the defendant failed in that regard — he did not advance a double jeopardy theory until well after the jury verdict had been returned — appellate review of the current claim is limited to plain error. See United States v. Rivera, 872 F.2d 507, 509 (1st Cir. 1989).

To succeed under plain error review, the defendant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). Given the ambiguity that shrouds the district court's statements and the peculiar nature of its actions, the occurrence of a double jeopardy violation was neither clear nor obvious. Thus, any error surely was not plain.

## B. **Fair Trial Considerations**.

At a bare minimum, see supra Part III(A), the lower court's so-called partial directed verdict exemplified its decision to narrow the scope of the charge lodged against the defendant. After the court took that position, it was perfectly reasonable for the defendant to expect the court to instruct the jury only on the "spoke" conspiracy. The court did just the opposite; it gave a generic conspiracy instruction and made specific references to the "hub" conspiracy (e.g., "the government claims that . . . Yeje-Cabrera . . . was the top supplier and . . . he had various people working with him . . . [and the defendant] would distribute [Yeje-Cabrera's cocaine]"). The court also told the jury that "[using] the garage . . . to store cocaine . . . would be facilitating the . . . conspiracy." By that allusion, the court could only have meant the "hub" conspiracy.

-16-

Following the charge, defense counsel objected. As the basis for the objection, counsel cited the incongruity between the instructions as given and the court's earlier grant of a partial directed verdict.[3] The court declined to modify the instructions.

Of course, the jurors were not present when the court partially directed a verdict, nor were they informed of that ruling at any later time. This is potentially important because the district court, when it reversed its field, used the fact that the jury was never privy to the erroneous ruling as one reason why the "rather generic jury charge regarding the law of conspiracy" allowed the jurors to convict the defendant of membership in the "hub" conspiracy. Green, 346 F. Supp. 2d at 338. We find that reasoning problematic.

As the defendant suggests, it is possible to think of this situation in terms of either a material variance or a constructive amendment of the indictment. See, e.g., United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987) (describing a variance, in the conspiracy context, as a "showing that the government proved understandings or agreements different from those charged" and explaining that a defendant can "upset a conviction" if prejudice results); United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985) (explaining that a constructive amendment, which embodies a

---

[3] As stated earlier, counsel did not interpose a double jeopardy claim at that point in the proceedings.

-17-

material alteration of the charging terms of the indictment, whether literally or in effect, is regarded as prejudicial per se). Either of these routes, if successfully pursued, would at most earn the defendant a retrial, and there is a simpler, more direct route that leads to precisely the same result. As we see it, the district court abridged the defendant's right to a fair trial when, after ruling one way, it proceeded to act in a wholly inconsistent manner without any prior notice.

Fair notice is one of the essentials in a trial, whether at the outset of the proceedings or at subsequent stages of the case. See, e.g., Russell v. United States, 369 U.S. 749, 760-64 (1962). The concern with fairness (and, hence, with notice) is heightened in criminal cases. A serious and prejudicial infringement of the right to a fair trail can violate due process. Cf. Neron v. Tierney, 841 F.2d 1197, 1200 (1st Cir. 1988) ("The Due Process Clause guarantees a criminal defendant that his trial will comport with prevailing notions of fundamental fairness." (citation and internal quotation marks omitted)). Where, as here, a court makes a ruling that places a criminal defendant on notice of the parameters of the charge to be put to the jury and subsequently reneges on that commitment without forewarning the defendant, the court's error is serious and may well be prejudicial. Cf. In re Fidelity/Micron Sec. Litig., 167 F.3d 735, 737 n.1 (1st Cir. 1999) (disapproving of "courts imposing rules of practice without some

form of notice that would allow the parties and their counsel to conform their conduct accordingly").  In this instance, prejudice is sufficiently likely to justify a new trial.

We elaborate briefly.  In announcing its partial directed verdict, the district court led the defendant to believe, at a minimum, that it was setting a course that would govern the remainder of the trial — only the "spoke" conspiracy would be put to the jury — and defense counsel was entitled to rely on that statement.  The court, however, did not deliver on its implicit promise; it refused, despite a contemporaneous objection, to conform its jury instructions to its earlier statement.  That action, undertaken without any notice whatever, offended fundamental fairness.  See Bae v. Peters, 950 F.2d 469, 478 (7th Cir. 1991) (acknowledging that a due process violation can occur if "a last-minute change in the charge . . . prejudice[s] a defendant's opportunity to defend himself"); cf. Lee County Branch of the NAACP v. City of Opelika, 748 F.2d 1473, 1480 n.12 (11th Cir. 1984) (observing that "due process . . . mandate[s] that when the rules of the game are changed, the players must be afforded a full and fair opportunity to play by the new regulations" (citation and internal quotation marks omitted)).

Having confirmed that an error of constitutional proportion occurred, we are confined in the remainder of our analysis by a special variant of the harmless error standard.

-19-

Under that formulation, we must order a new trial unless the government, as the beneficiary of the error, can show beyond a reasonable doubt that the error did not contribute to the verdict. Chapman v. California, 386 U.S. 18, 24 (1967); United States v. Flores, 968 F.2d 1366, 1372 n.7 (1st Cir. 1992). This means that the government must convince us, beyond any reasonable doubt, that the guilty verdict in this case was unaffected by the district court's tergiversation. The government has not carried that burden.

The defendant was at least arguably prejudiced by the court's actions in two ways. First, the transcript makes it abundantly clear that defense counsel shaped his summation around the narrower charge that the court had led him to believe would be put to the jury. That argument focused exclusively on the absence of credible evidence of the defendant's personal involvement with cocaine. The lawyer neither challenged the defendant's putative membership in the broader conspiracy nor addressed the concept of multiple conspiracies. Second, defense counsel never requested a multiple conspiracy instruction, even though the defendant, so long as the "hub" conspiracy remained in play, may well have been entitled to one. See, e.g., United States v. Boylan, 898 F.2d 230, 243 (1st Cir. 1990) ("If, on the evidence adduced at trial, a reasonable jury could find more than one . . . illicit agreement, or could find an agreement different from the one charged, a

-20-

multiple conspiracy instruction is proper and should be given if requested."). We think it quite likely that, had counsel known that the court would reverse direction and permit the jury to mull the larger "hub" conspiracy, he would have pressed for such an instruction.

The short of it is that the defendant tailored his summation and his requests for instructions to what the court had indicated would be the focal point of the jury deliberations. The court, however, pulled the rug out from under the defense when, without notice or an opportunity for cure, it reverted to a different, inconsistent focal point. Had defense counsel been forewarned, he could have made a much more forceful summation and, in all probability, received a more favorable charge (one that included a multiple conspiracy instruction). Given the disadvantages under which the court's error forced defense counsel to labor, we are not persuaded that, absent the error, the verdict would inevitably have been the same. The error, therefore, cannot be deemed harmless.[4]

---

[4] The soundness of the so-called partial directed verdict is immaterial here. Whether or not the court's ruling was correct — a matter on which we take no view (although we note that the district court later said that its pronouncement was incorrect) — the dispositive considerations are that the defendant relied on it and that the court acted inconsistently with it.

-21-

## IV. CONCLUSION

We need go no further. Although double jeopardy does not bar the further prosecution of this defendant on the conspiracy charged in count 1 of the indictment, an error occurred in the course of his trial. The claim of error was preserved and, under the applicable standard, the error was not harmless. Accordingly, we vacate the judgment below and remand the case to the district court for a new trial. The so-called partial directed verdict is of no further force or effect and, therefore, the "scope of the conspiracy" issue remains open.

**Vacated and remanded**.

— Concurring Opinion Follows —

**STAHL, <u>Senior Circuit Judge</u>, concurring in the judgment.**

I agree with my colleagues in the majority that Jason Pacheco's trial for cocaine conspiracy was not conducted in accordance with the requirements of the Due Process Clause.  I also agree that this case must be remanded to the district court for a new trial.  I write separately because my view of the solution is somewhat different from that of the majority.

**I.**

In December 2001, Pacheco was indicted together with twenty co-defendants on one count of conspiring to possess cocaine with intent to distribute.[5]  He was tried separately from the others.  At trial, the government presented evidence of a complex operation involving one kingpin, Rafael Yeje-Cabrera, and numerous aides, underlings, couriers, and dealers.  Pacheco's alleged role was that of a dealer.

---

[5] The indictment read as follows:
From a date unknown to the Grand Jury, but from at least on or about July 7, 2000, and continuing thereafter until on or about December 20, 2001, at Westport, elsewhere in the District of Massachusetts, in the District of New York, in the District of Arizona, in the District of Tennessee, and elsewhere,
[twenty named individuals and],
21. JASON PACHECO,
defendants herein, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury, to possess with intent to distribute, and to distribute, more than 5 kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

At the close of the evidence, Pacheco moved for a directed verdict, arguing that the prosecution had not carried its burden of proof.[6] The district court denied the motion in part and granted it in part, indicating that the government had shown, at most, that Pacheco was a participant in a small "spoke" conspiracy, rather than part of the overarching "hub" conspiracy headed by Yeje-Cabrera.[7] The court's ruling on Pacheco's motion ("the Rule 29 order") was entered on the docket. The judge then submitted the case to the jury without telling them anything about his ruling. The jury returned a verdict of guilty, specifying on the verdict sheet that they attributed "more than five kilograms of cocaine" to Pacheco.[8]

## II.

On appeal, Pacheco argues that the district court's Rule 29 order acquitted him, at least partially, of the charges against him. The judge's later submission of the case to the jury, the

---

[6] The defendant's motion was originally made in written form and was entitled "Motion for a Directed Verdict." As the majority notes, the procedural device formerly termed a motion for directed verdict has been replaced with the motion for a judgment of acquittal. See Fed. R. Crim. P. 29. The district court and the parties used the "directed verdict" language as well as referring directly to Rule 29.

[7] Much evidence about the Yeje-Cabrera conspiracy, which was responsible for hundreds of kilograms of cocaine, had been introduced at trial; the evidence linking Pacheco to any cocaine was much more limited.

[8] The peculiar sequence of motions and orders that followed the jury verdict is ably laid out in the majority opinion.

argument continues, placed Pacheco in jeopardy for a crime of which he had already been acquitted, in violation of the Double Jeopardy Clause.[9] We are thus called upon to determine whether and to what degree the defendant's jeopardy ended when the district court entered its order.[10] See Gonzalez v. Justices of the Mun. Ct., 382 F.3d 1, 10 (1st Cir. 2004), vacated, 125 S. Ct. 1640 (2005) (mem.), reinstated, 420 F.3d 5 (1st Cir. 2005). The majority concludes that Pacheco's appeal fails because the district court's order did not constitute an acquittal, and so the defendant's original jeopardy was never terminated. I reach the same conclusion, but by a different route from that taken by my colleagues.

### A.

The question of how to characterize the district court's order "is a difficult one and is probably not susceptible to an abstract answer unrelated to context." United States v. Oreto, 37 F.3d 739, 748 (1st Cir. 1994). The majority opinion lists three reasons for its conclusion: (1) the district court denominated the

---

[9] "Subjecting the defendant to post-acquittal factfinding proceedings going to guilt or innocence violates the Double Jeopardy Clause." Smith v. Massachusetts, 125 S. Ct. 1129, 1134 (2005) (quoting Smalis v. Pennsylvania, 476 U.S. 140, 145 (1986)).

[10] I note that the ruling was (a) made in response to the defendant's written motion and after a hearing was held, (b) discussed by the court in the context of Rule 29, and (c) entered on the docket on March 24, 2003. The fact that the ruling was made in response to a formal motion by the defendant is at odds with the majority's characterization of the district court's order as a mere "comment on evidentiary sufficiency."

order as "partial," (2) the court denied the defendant's concurrent motion for a required finding of not guilty, and (3) after giving its order, the court then sent the case to the jury. All three of these reasons boil down to the same idea: the district court acted like the order was not a complete acquittal as to the crime charged, so there was no acquittal. I question at least two aspects of this appraisal.

First, the fact that the judge sent the case to the jury, in particular, cannot logically be considered evidence that the Rule 29 order was not an acquittal. This is because the defendant's argument on appeal is that the act of sending the case to the jury, itself, constituted a Double Jeopardy violation, because that act followed an acquittal. To say that because the judge submitted the defendant to post-order fact-finding by a jury, therefore he did not acquit the defendant in the first place, is circular reasoning.[11]

Second, the majority opinion implies, and I agree, that it would have been lawful, under the terms of this indictment, for the jury to convict the defendant solely of participation in the smaller "spoke" conspiracy. See United States v. Miller, 471 U.S.

_____

[11] There is no doubt that the district court's actions in this case were unusual and perplexing. An unusual turn of events in a trial courtroom does not, of course, preclude a determination that the events did not offend the Constitution. Nor is the constitutional violation mitigated just because the judge's order was legally erroneous. See Samaria v. United States, 437 U.S. 54, 64 (1978).

130, 131 (1985) (upholding conviction "based on trial proof that supports only a significantly narrower and more limited, though included, fraudulent scheme" than that alleged in the indictment). See also United States v. North, 86 Fed. Apex. 427, 433 (1st Cir. 2004) (vacated on other grounds, 125 S. Ct. 1022 (2005)) ("A perfect alignment between the indictment's charge and the offense conduct of conviction is not required. . . . as long as the trial proof corresponds to an offense which was clearly set out in the indictment.") (citing Miller, 471 U.S. at 136); United States v. Partially, 167 F.3d 687, 702 (1st Cir. 1999) (approving of jury instruction that limited duration of conspiracy to scheme narrower than, but included within, scheme alleged in indictment).

I believe it is inconsistent to argue both that (1) the defendant could have been convicted of either conspiracy and (2) it was impossible for the district court to have granted a partial acquittal. Moreover, "[the appropriate inquiry is functional, not semantic. Thus, an inquiring court is duty bound to ascertain 'whether the ruling of the judge, whatever its label,'" counts as an acquittal for Double Jeopardy purposes. Gonzalez, 382 F.3d at 10 (quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977)). It is therefore inappropriate to rely on the district court's own descriptions of its action as dispositive of the import of that action.

**B.**

My analysis of whether the Rule 29 order was an acquittal begins with the definition of "acquittal" set out by the Supreme Court in Martin Linen and recently restated in Smith. The Court has defined an acquittal, for Double Jeopardy purposes, to include a court order that "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." Smith, 125 S. Ct. at 1134 (quoting Martin Linen, 430 U.S. at 571). I do not think the district court's partial grant of the defendant's motion for a directed verdict, despite the order's nomenclature and its invocation of Rule 29,[12] meets this definition of acquittal.

It is evident from the discussion that took place at the hearing on Pacheco's motion for a directed verdict that the judge drew a distinction between a large "hub" conspiracy headed by Yeje-Cabrera and a smaller "spoke" conspiracy that Pacheco was allegedly involved in. The judge stated his belief that the prosecution had failed to present sufficient evidence to prove Pacheco was a member of the overarching "hub" conspiracy.[13] He also presumed that the

---

[12] That rule states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. The district court evidently intended to act under Rule 29. The judge stated, for example, "I'm telling you under Rule 29 I'm directing down to the little [conspiracy]."

[13] Later, at the sentencing hearing, the judge reiterated, "[At trial I became satisfied . . . that you were not part of some

-28-

overarching conspiracy could be eliminated from the picture while leaving the smaller conspiracy charge in place to be sent to the jury.[14]

A criminal conspiracy is both defined and confined by the unlawful agreement at its heart. See Brakeman v. United States, 317 U.S. 49, 53 (1942); see also United States v. Glenn, 828 F.2d 855, 857 (1st Cir. 1987) ("[Conspiracy law, like most criminal law, focuses upon the activities of an individual defendant. It is therefore dangerous to think of a conspiracy as a kind of "club" that one joins . . . . Instead, the gist of the conspiracy offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant.") (internal quotation marks and alterations omitted). Pacheco was tried separately from the other defendants named in the indictment. It was up to the jury to determine what sort of any

_____

overarching 260 kilogram conspiracy. And that's why I gave the partial directed verdict."

[14] That this was the judge's view is made clear from the following statement made by the judge to the prosecutor:

THE COURT: Mr. Wilson [(defense counsel)] is not wrong when he talks about conspiracies within conspiracies. On [the government's] best evidence I think we have this. Here is the, what I'll call the Cabrera conspiracy. On your best evidence here's the Pacheco conspiracy. . . . Now, the conspiracy for which Mr. Pacheco is liable, if everything goes your way, is this [spoke] conspiracy. That's what he's in on. . . . [Against his motion for directed verdict that's the conspiracy you've proved. You've proved no more. We're not having any more.

-29-

unlawful agreement, if any, Pacheco himself was guilty of making. Although not every conspiracy Pacheco might have participated in was covered by the language of the indictment, that language was broad enough to cover more than one possible agreement.

To my mind, the most apt characterization of the "hub" conspiracy and the "spoke" conspiracy is to describe them as two different prosecution theories of the case. The district court could have, and probably intended to, take one of the two theories off the table for insufficient proof.[15] Cf. United States v. O'Shea, 426 F.3d 475, 479 n.3 (1st Cir. 2005) (describing how district court ruled the evidence was insufficient to sustain one of the prosecution's theories of the case and accordingly instructed the jury on only the remaining theory). It is perfectly plausible to read Martin Linen's requirement of "a resolution, correct or not, of some or all of the factual elements" to apply to a discrete prosecutorial theory, as well as to an individual charge in the indictment. In the present case, however, the court did not

---

[15] The district court would also, of course, have been within its power to exclude irrelevant evidence (e.g. evidence not going to an unlawful agreement made by Pacheco himself) or to knock the indictment down to a lesser included charge if it found the government had failed to prove the charged offense. See Fed. R. Crim. P. 31(c); Schmuck v. United States, 489 U.S. 705, 716-17 (1989). However, that is not what happened here. The district court was not persuaded by defense counsel's argument that the government had failed to prove the requisite five kilograms of cocaine. Counsel and the court discussed, but did not resolve, the question whether conspiracy to possess 500 grams of cocaine was a lesser included offense of the charged five-kilogram conspiracy.

adequately distinguish the two theories, and the defendant did not point us to anyplace in the record where the distinction was laid out, for us, on appeal, to be able to say that there was an acquittal on one of the theories. Practically speaking, I cannot see how we could send the case back for a new trial on the "spoke" theory but not on the "hub" theory. We simply do not know enough about the difference between the two alleged conspiracies.

### III.

In my view, a partial acquittal on a single-count indictment is a theoretically possible outcome. It simply did not happen here. However, I agree with the majority that the transpiration of events at Jason Pacheco's trial violated the requirements of the Due Process Clause. I therefore concur in the judgment of the court granting the defendant a new trial.