USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1056 UNITED STATES OF AMERICA, Appellee, v. WILLIAM A. TWITTY, Defendant, Appellant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued December 28, 1995, is amended as follows: Page 3, line 22: Change "July 1990" to "July 1991". Page 6, second full paragraph, line 9: Insert the word "not" after the word "does". UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1056 UNITED STATES OF AMERICA, Appellee, v. WILLIAM A. TWITTY, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Aldrich and Coffin, Senior Circuit Judges. _____________________ ____________________ Evan Slavitt, by Appointment of the Court, with whom Mary P. _____________ _______ Murray, and Hinckley, Allen & Snyder were on briefs for appellant. ______ ________________________ Michael J. Pelgro, Assistant United States Attorney, Organized ___________________ Crime Drug Enforcement Task Force, with whom Donald K. Stern, United ________________ States Attorney, was on brief for the United States.  ____________________ December 28, 1995 ____________________ BOUDIN, Circuit Judge. By a superseding indictment, ______________ William Twitty was charged with four others with conspiring to violate federal firearms laws by unlawfully purchasing, possessing and selling handguns. 18 U.S.C. 371. Twitty was also named in two other counts: one for unlawfully dealing in firearms, id. 922(a)(1)(A), and the other for ___ unlawfully possessing handguns with obliterated serial numbers, id. 922(k). The events alleged took place in the ___ Boston area from 1990 to 1993.  Prior to trial, three co-defendants--Erik Martin, his wife Stephanie Martin, and Twitty's half-brother Stephen Jordan--pled guilty. The last co-defendant, Pierre Cameron, pled guilty after the jury was selected for his joint trial with Twitty. The evidence against Twitty, taken in the light most favorable to the verdict, United States v. Brien, 59 _____________ _____ F.3d 274, 275 (1st Cir.), cert. denied, 116 S. Ct. 401 _____ ______ (1995), permitted the jury to find the following facts (which we supplement, as required, in discussing individual issues). In January 1990, Cameron assisted Erik Martin in securing a federal firearms license, enabling the latter to order firearms wholesale through the mails and to deal in firearms. Twitty and the Martins were very close friends. Beginning in March 1990, Erik Martin used his federal license and local permits to acquire handguns for Twitty, Cameron, and later Jordan. Stephanie Martin was involved primarily in -2- -2- receiving the shipments and, in one instance, in placing an order at Twitty's behest when Erik Martin was unavailable. Twitty introduced Jordan to Erik Martin in September 1990. While Jordan often dealt directly with Erik Martin, Twitty and Jordan were involved with each other on certain occasions. For example, Twitty delivered purchase money from Jordan to Martin in one instance in late 1990. In the same period, Twitty drove Jordan and Erik Martin to a store where Jordan bought a grinding device, later used to obliterate serial numbers from the guns and stored for a time in Twitty's basement.  In early 1991, shortly after Jordan's apartment was raided by police, Twitty began to order handguns through Erik Martin on a large scale. Twitty acquired a beeper. Despite having a very low paying job, Twitty began to show signs of unusual prosperity, buying new clothes, jewelry, and cars and making large deposits in a new bank account. There was evidence, including police seizures of firearms, that the guns ordered by Twitty were being resold illegally in the Boston area and that Twitty and Erik Martin were obliterating the serial numbers. Cameron also bought guns from Erik Martin but in much smaller numbers. In July 1991, federal agents tracing a recovered firearm sought to interview Erik Martin. The last gun shipment to Martin arrived on July 10 and that same day he conferred with -3- -3- Twitty about the federal inquiry. Over the next several days, Twitty sought to destroy evidence of the transactions at the Martin house and asked Martin to have Cameron make up phony paperwork to help conceal the disposition of the weapons. Twitty also told Erik Martin to file a false police report that the latter's records, required to be kept by him as a licensed dealer, had been stolen.  At the end of July, Twitty left his home and his job without explanation. Erik Martin met him by accident in November 1991 and they discussed the continuing federal investigation, Twitty promising to help Martin "straighten the whole matter out" so that Martin could avoid jail. In December 1991, Twitty was interviewed by federal agents and denied knowledge of the firearms conspiracy. Shortly after his arrest, in September 1993, Twitty gave handwriting exemplars that were intentionally distorted. At trial, Twitty did not contest the existence of a firearms conspiracy, virtually conceding that a conspiracy existed among Erik Martin and others. Instead, Twitty denied his own participation in the conspiracy and sought to undermine the credibility of Erik Martin, who provided much of the direct evidence of Twitty's involvement. The jury convicted Twitty on all three counts. He was later sentenced to 97 months' imprisonment and now appeals both his conviction and his sentence. -4- -4- 1. In this court, Twitty's boldest argument is to claim, essentially for the first time, that the evidence showed three different conspiracies (between Erik Martin and, respectively, Cameron, Twitty, and Jordan). Twitty agrees now that the evidence was sufficient to show his own involvement but only in the narrow conspiracy between him and Erik Martin. And he argues that he was prejudiced by the admission of evidence that related solely to the other two supposedly separate conspiracies, those between Martin and Cameron and between Martin and Jordan.  Twitty's argument is a common one in conspiracy appeals. Whenever a conspiracy involves successive transactions and multiple players, it is usually possible to slice the enterprise into discrete portions. Even a single conspiracy is likely to involve subsidiary agreements relating to different individuals and transactions. And more often than not, none of the agreements is explicit; agreement is inferred from conduct; and the conceptual tests used to distinguish between one conspiracy and many are not sharp edged. See, e.g., United States v. Drougas, 748 F.2d 8, 17 ___ ____ ______________ _______ (1st Cir. 1984). In this case, the government offers a number of answers to Twitty's argument, including a claim that he waived it, but we think that taken together two points are sufficient. First, ample evidence linked Twitty and Jordan to single -5- -5- conspiracy with the Martins. Twitty introduced Jordan to Erik Martin; conveyed money from Jordan to Martin; traveled with both when Jordan purchased a grinding device that could obliterate serial numbers; pressed Martin to expand operations after Martin lost some of Jordan's gun-purchasing money; discussed gun deliveries with Jordan; and stayed in continuing touch with him. On the bases of these and other connections, the jury did not have to stretch to conclude that Twitty, Erik and Stephanie Martin, and Jordan conspired together to traffick in weapons. Twitty's and Jordan's illegal dealings with the Martins occurred in the same time frame, in the same area and in the same manner. Taking these overlaps together with the direct contacts between Twitty and Jordan, we think that a single hub and spoke conspiracy among the four was shown. E.g., see United States v. Dworken, 855 F.2d 12, 24 (1st Cir. ____ ___ _____________ _______ 1988). Second, it is more of a stretch to include Cameron in the same conspiracy, although perhaps not impossible. But if we assume arguendo that Cameron engaged in a separate ________ conspiracy with the Martins, we think that the variance between the larger five-person conspiracy charged, and the smaller four-person conspiracy amply proved against Twitty, was harmless. So long as the statutory violation remains the same, the jury can convict even if the facts found are -6- -6- somewhat different than those charged--so long as the difference does not cause unfair prejudice. United States v. _____________ Glenn, 828 F.2d 855, 858 (1st Cir. 1987). _____ No such prejudice has been shown here. Even if the conspiracy charged had been narrowed to four persons, some of the evidence against Cameron could have been admitted to explain how Erik Martin began his business and how, at the end, Twitty attempted to use Cameron to conceal his own wrongdoing. While the evidence against Jordan involved drugs, Twitty's appeal briefs point to nothing especially dramatic about the bulk of the evidence against Cameron. Some guns were recovered from Cameron's apartment but, given the guns recovered from Jordan and the Martins and the large volume of orders by Martin, the presence of guns was hardly in doubt. 2. Twitty's next set of objections involves the admissibility of evidence designed to show that the guns obtained through the Martins were unlawfully re-sold by Twitty and others. The first objection is easily resolved. During 1991 and 1992, the police recovered from third parties handguns with obliterated serial numbers. The government at trial offered evidence of such incidents to show that the serial numbers (restored in whole or part) and gun types matched those ordered by Martin and passed on to Twitty, Jordan, or Cameron. Much of this evidence was undisputed. -7- -7- As to two such instances, however, Twitty says that the evidence was insufficient to connect the seized guns to guns ordered through Martin. In one, the gun types matched a delivery to Martin on the same day; Martin testified that he had delivered them to Twitty, who immediately ground down the numbers; and the partly restored numbers matched those of the guns Martin had received. All that was required for admission was evidence sufficient to permit a reasonable jury to conclude that the guns were the same, Fed. R. Evid. 901(a), and that was plainly present. In the other instance, a handgun was recovered six days after delivery of three guns of the same type to Martin for Twitty. Although the recovered weapon had an obliterated serial number, an expert testified that three restored digits (two others could not be restored) were consistent with those on one of the guns received by Martin six days earlier. Again, this was sufficient for the court to admit the evidence, since a rational jury could find that this weapon was one of the guns received by Martin. With more cause, Twitty objects to statistical evidence offered at trial by the government for the same general purpose, namely, to show the conspiracy's resale of guns. A Boston police ballistic expert testified that, in the summer of 1991, he noticed a sharp increase in police recoveries of Davis .380 caliber semiautomatic pistols with serial numbers -8- -8- obliterated in the same manner. Based on police department computer records, he testified that there were no such recoveries from 1988 to May 1991 and that from mid-May 1991 to the end of the year, there were 30 such recoveries, plus 13 in 1992 and 9 in 1993. According to the witness, similar, but less dramatic, increases occurred in the same time frames in two other categories of weapons with obliterated serial numbers: the Raven .25 caliber semiautomatic pistol and the Intratec Tec-9 9mm semiautomatic pistol. The significance of these figures was that other government evidence showed that Martin had received at least 255 handguns from July 1990 to July 1991, all but about 30 being delivered after April 1, 1991; and 206 of these weapons were of the three types whose street seizures had increased markedly in 1991 and thereafter. On appeal, Twitty says that the evidence was irrelevant, unnecessary, duplicative, and prejudicial. As to relevance, Twitty does not attack the quality of the data, see, e.g., ___ ____ United States v. Trenkler, 61 F.3d 45, 59 n.21 (1st Cir. ______________ ________ 1995), nor does this case involve the kind of statistical inference whose remoteness from the facts of the case has on occasion troubled courts. See, e.g., Smith v. Rapid Transit, ___ ____ _____ ______________ Inc., 58 N.E.2d 754, 755 (Mass. 1945). Twitty argues only ____ that the evidence did not show that the seized guns listed in the computer came from the conspiracy, but we think that the -9- -9- inference from the statistics, the weapon types, and the timing showed enough of a connection. Twitty next argues--to support his claim that this statistical evidence was unnecessary and duplicative--that the existence of a gun trafficking conspiracy was effectively conceded at trial and that other non-statistical evidence sufficed to prove that some guns ordered by Martin had been resold. But other considerations aside, the statistical evidence tended to support claims of sales by or through Twitty since he had prompted many of the orders and the increase in recoveries coincided with his greater involvement. This reinforced the very connection to the conspiracy that Twitty sought to deny at trial. Twitty's most direct argument is that the statistical evidence was unduly prejudicial, tending to link him with a gun epidemic in Boston. Yet proving that the weapons reached the street merely spells out what was implicit in the proof that large numbers of guns were delivered to Martin for Twitty and that Twitty's financial condition had improved sharply. The statistical evidence from the ballistics expert was not lurid or blood-curdling. The balancing of probative value against unfair prejudice is weighted in favor of admissibility, see Fed. R. Evid. 403, and confided primarily ___ to the sound discretion of the trial judge. United States v. _____________ -10- -10- Sutton, 970 F.2d 1001, 1008 (1st Cir. 1992). There was no ______ abuse of discretion here. 3. Twitty's most potent claim relates to his sentence. Under amendments effective on November 1, 1991, the Sentencing Guidelines increased the penalties for firearms offenses. Twitty points out that no more guns were obtained after July 1991, no sales after that time were proved, and that after July his own contacts with other conspirators were minimal. He contends that either the conspiracy was abandoned or he had withdrawn from it prior to November 1, 1991, entitling him to the lower penalty available under the earlier version of the guidelines. See United States v. ___ _____________ Garafano, 36 F.3d 133, 134 (1st Cir. 1994). ________ The pre-sentence report said that the conspiracy should be deemed to continue past November 1, 1991, because not all of the weapons had been recovered by that date; but on appeal even the government does not defend this position, which would extend many such conspiracies indefinitely. Nor does it matter that the indictment alleged a conspiracy continuing _______ to on or around December 1991 and the jury convicted, for on the evidence presented, and under the charge given to it, the jury had no reason to care whether the conspiracy ended in July or December or whether Twitty withdrew from it in its wind-down phase. -11- -11- There is one other basis for applying the amended guideline but we think that it is insufficient, although possibly a close call. In an alternative finding, the district judge ruled that the conspiracy included a cover-up effort that did continue past November 1991. Mere efforts to conceal a crime do not automatically extend the life of the crime itself, but acts of concealment can extend the life of a conspiracy if the proof shows "an express original agreement among the conspirators to continue to act in concert in order to cover up" their crime. Grunewald v. _________ United States, 353 U.S. 391, 404 (1957); e.g., United States ______________ ____ _____________ v. Bigos, 459 F.2d 639, 643 (1st Cir.), cert. denied, 409 _____ _____ ______ U.S. 847 (1972) (hijacking plan included explicit agreement to cover up). In this case the government does urge that there were express agreements to conceal when, as already recounted, Twitty in July 1991 enlisted Martin to persuade Cameron to provide a false cover story to mislead federal agents and to file a false theft report with the Boston police. While these events occurred prior to November 1991, Twitty met the Martins in November, promising to help keep Martin out of jail and thereafter lied to federal agents. If ordinary conspiracy rules governed, the July actions might be enough to infer that the conspiracy had been enlarged to include concealment as an objective. -12- -12- Grunewald, however, laid down special requirements of _________ proof resting upon a distinct policy concern, namely, that "every conspiracy is by its very nature secret"; that "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces"; and that if these facts were enough for a conspiracy to conceal, then the statute of limitations and other safeguards would be virtually "wipe[d] out." 353 U.S. at 402. For this reason, it held that even egregious and organized acts of concealment were not sufficient,1 unless agreed to as part of the original conspiratorial plan. It summarized the point thusly:  [A] vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime. Id. at 405.  ___  ____________________ 1In Grunewald itself, as the Court recounted, _________ [G]reat efforts were made to conceal the conspiracy when the danger of exposure appeared. For example, Bolich got rid of certain records showing that he had used Grunewald's hotel suite in Washington; Patullo's accountant was persuaded to lie to the grand jury concerning a check made out to an associate of the conspirators; Grunewald attempted to persuade his secretary not to talk to the grand jury; and the taxpayers were repeatedly told by Halperin and his associates to keep quiet. 353 U.S. at 403. -13- -13- While there were arguably explicit agreements to conceal between Twitty and Martin, they occurred late in the day when the conspirators knew that agents were on their trail and active trafficking in guns had come to an abrupt halt. On any realistic view of the matter, Twitty and Martin were engaged "only [in] covering up after the crime." This might be a closer case if the conspirators had continued their gun trafficking and agreed to new measures of concealment as part of an expanded conspiracy. Id. (distinguishing concealment ___ "in furtherance of" an ongoing conspiracy). We do not think that our conclusion involves a disagreement with the able trial judge about facts he found or even characterizations, matters on which the clearly erroneous standard is normally applied. United States v. ______________ Wright, 873 F.2d 437, 444 (1st Cir. 1989). Rather, we read ______ Grunewald to impose a special burden to show that an express _________ agreement to conceal was, or at least became, part of the central conspiratorial agreement and that the later acts relied upon were in furtherance of this agreement. There are no findings to this effect in our case and no evidence that we think would permit such findings.2  ____________________ 2The government does rely on one set of concealment measures that occurred during the course of the conspiracy-- the obliterating of serial numbers. But these arrangements, probably designed in part to increase the selling price of the weapons, were a narrow effort having nothing directly to do with the acts occurring in or after November. -14- -14- Twitty also objects to the district court's decision to apply a four-level enhancement for his role in the offense as an organizer or leader. U.S.S.G. 3B1.1(a). This status requires that the criminal activity of the organizer or leader either involve five or more participants or be "otherwise extensive." The sentencing judge found all of these requisites, namely, that Twitty was an organizer or leader, that there were five members in the conspiracy, and that the activities were otherwise extensive.  The evidence indicated that during the first half of 1991, Twitty made the basic decisions about how many guns to purchase and when to buy and sell them, substantially increasing the number of weapons acquired through the Martins. A defendant who "makes the critical strategic and operational decisions" in a group enterprise can be deemed an organizer or leader. United States v. Talladino, 38 F.3d _____________ _________ 1255, 1261 (1st Cir. 1994). By this test, Twitty qualifies even without regard to other evidence that tends to reinforce his prominent role in the group. Unless Cameron is considered a member of the conspiracy, an issue that we do not reach, the number of clearly established conspirators is only four. Regardless of numbers the criminal activities themselves were "otherwise extensive." The number of guns obtained and sold was substantial; the conspiracy extended over many months; and -15- -15- the arrangements--acquisition from out of state sources, obliterating of serial numbers, and distribution--was reasonably elaborate. That is enough to support the district court's findings. See United States v. Rostoff, 53 F.3d 398, ___ _____________ _______ 414 (1st Cir. 1995).  Twitty has raised several other claims regarding the admissibility of other evidence (e.g., testimony as to an ____ admission made by Twitty) and the lack of an evidentiary hearing at sentencing on Twitty's use of drugs. We have examined his arguments on these issues but conclude that they are without merit and do not require individual discussion. This is not intended as criticism of counsel; the case has been well briefed on both sides. The judgment of conviction is affirmed. The sentence is ________ vacated and the case remanded for resentencing under the _______ ________ earlier version of the Sentencing Guidelines. It is so ordered. ________________ -16- -16-