# United States Court of Appeals
## For the First Circuit

---

No. 08-2441

UNITED STATES OF AMERICA,

Appellee,

v.

EDIBERTO RIVERA-DONATE, a/k/a "YEYE," a/k/a "BALA BLANCA,"

Defendant, Appellant.

---

No. 08-2541

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN J. GONZÁLEZ-PÉREZ, a/k/a "JUANCHO,"

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

---

Before

Torruella, Stahl, and Thompson,
Circuit Judges.

---

Ignacio Fernández-de Lahongrais, for appellant González-Pérez.
Jorge L. Armenteros-Chervoni, for appellant Rivera-Donate.
Warren Vázquez, Assistant United States Attorney, with whom

Rosa Emilia Rodríquez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and George A. Massucco-LaTaif, Assistant United States Attorney, were on brief for appellee.

----

June 7, 2012

----

**TORRUELLA, Circuit Judge.** Defendants-Appellants Ediberto Rivera-Donate ("Rivera") and Juan González-Pérez ("González") (collectively, the "Defendants") were convicted by a jury on charges of conspiracy to possess with intent to distribute multi-kilogram quantities of controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846. On appeal, the Defendants individually raise various challenges to their convictions, with González also bringing a challenge to his sentence. After careful consideration, we affirm in all respects.

## I. Background

### A. The Indictment

In October of 2003, the Drug Enforcement Administration began an investigation into the drug-trafficking organization run by Alfredo Martínez-Figueroa ("Martínez") in the area of Ponce, Puerto Rico. Since 1998, Martínez's organization distributed cocaine, cocaine base (crack), heroin, and marijuana from drug points operating in various public housing projects, wards, and neighborhoods located primarily in the southern region of Puerto Rico. The organization also shipped narcotics to the continental United States.

On December 1, 2005, a grand jury returned a multi-count indictment[1] charging forty-two people, including the Defendants in

_____

[1] For purposes of this appeal, we limit ourselves to Count One of the indictment, containing the distribution charges for which the defendants were convicted.

this case, with, inter alia, conspiracy to distribute narcotics "at La Ferrán Ward, Nueva Atenas and Méndez Vigo streets, [the] Arístides Chavier Public Housing Project, and [the] Ponce Public Housing Project in Ponce, Puerto Rico." The indictment identified the Defendants as enforcers of the drug-trafficking organization. According to the indictment, enforcers were those persons who possessed, carried, used, and brandished firearms "to provide protection to the leader of the organization as well as to the drug operations of the conspiracy from rival drug trafficking organizations." The Defendants were also both identified as drug point owners, while Rivera was specifically pegged as a drug processor and González as a supplier of cocaine for other drug points. In addition, Rivera was charged with participating in the March 13, 2005 killing of Luis Torres-Acevedo ("Torres") in furtherance of the conspiracy.

After the Defendants pled not guilty, Rivera filed motions to strike the overt act contained in paragraph 27 of the indictment ("overt act #27") charging him with participation in the killing of Torres. He also sought to exclude alleged co-conspirator statements made in furtherance of the conspiracy and to dismiss the indictment and/or to sever his case. These motions were denied.

-4-

## B. Relevant Testimony at Trial

The government's main cooperating witness at trial was Jason Barreira-Camacho ("Barreira"), an admitted drug user and murderer[2] who was arrested in 2005 for possession of a firearm. Barreira testified that he began working for Martínez's organization in 2001 and held responsibilities as an enforcer, runner, seller, and processor. In his testimony, Barreira defined enforcers, including himself, as organization members having the "duty to kill anybody trying to interfere with the La Ferrán drug point belonging to [] Martínez." Barreira provided detailed testimony concerning both Rivera and González's involvement in the conspiracy.

Barreira testified that he discussed with Rivera the latter's purchasing of cocaine from Osvaldo Zapata-Cruz (a.k.a. "Valdo") during 2004, and his subsequent distribution of the drugs in the Santiago Iglesias housing project. Valdo was Martínez's right-hand man and in charge of cocaine distribution for the organization both in Puerto Rico and to the continental United States. Barreira also identified Rivera as a drug processor for Martínez's organization and testified that in early 2005 he saw Rivera processing marijuana along with another co-conspirator at the house where Barreira resided prior to his arrest. This house

---

[2] Barreira testified to having committed nine murders and two attempted murders prior to his arrest, during which time he operated as a member of Martínez's drug trafficking organization.

was located in Quebrada del Agua, Ponce, which is only a short car ride away from La Ferrán Ward and the housing projects listed in the indictment.

Barreira also testified that an unindicted co-conspirator known as "Chito" confessed to Barreira while in Rivera's presence that he had accidentally murdered an innocent person as part of a drive-by shooting in which Rivera participated as the driver.[3] According to Barreira, Chito stated that the shooting was meant to target a person who had allegedly stolen five kilos of cocaine from Valdo. The unintended victim of the shooting turned out to be Torres, who had been riding in the car with the intended target. Barreira testified that, as Chito recounted the events leading up to the shooting and its aftermath, Rivera confirmed the story "saying that, yes, it's true, just as Chito told you it happened, that's how it went down."

According to Barreira's testimony, upon hearing of the botched drive-by, Valdo became "very, very upset" and asked Barreira to confiscate Chito's weapon. Subsequently, and at his request, Chito handed Barreira a .357 Magnum -- the same gun that the police later found in Barreira's possession on the day of his arrest. Barreira testified at trial that he incorrectly assumed

---

[3]   Barreira testified that "Chito was a real good friend of Rivera['s]" and had been "working the marijuana along with Rivera" at Quebrada del Agua.

this was the same gun that Chito had used to commit the Torres murder.[4]

As to González, Barreira testified that, beginning in 2005, González received cocaine from co-conspirator Heriberto Rodríguez-Rosa ("Rodríguez") for his own distribution. On one occasion, Barreira personally saw Rodríguez give some cocaine to González. Subsequently, González approached Barreira directly and requested a supply of heroin for distribution in the Ponce Housing Project "because [González indicated that] Rodríguez[] was already supplying him with crack cocaine." Barreira asserted that González was distributing the cocaine in the Ponce Public Housing Project. This testimony was corroborated by Eddie Vidal ("Vidal"), a government witness and case agent, who indicated that Rodríguez would give cocaine to González for distribution in the Ponce Public Housing Project.

In addition, both Barreira and another of the government's witnesses, Marcos Rentas-Camacho ("Rentas"), identified González as an enforcer for the organization. Rentas generally described "enforcers" as members of the gang who "set order [to] the drug point" and would go to "war" with other gangs.

_____

[4]   As will be discussed infra, in an affidavit made to state prosecutors upon his arrest in 2005, Barreira stated that the pistol the police confiscated from him on the day of his arrest -- a .357 Magnum -- had been the same weapon used to kill Torres on March 13, 2005. However, ballistics testing would later conclude that the gun found on Barreira could not have been the murder weapon.

Both witnesses testified that González would "hang around" the La Ferrán drug point, armed and in the company of other charged co-conspirators; Rentas specified that González would go to La Ferrán "armed" to "protect the entire drug point." Barreira, in turn, indicated the kind of weapon that González would carry in the performance of his duties as an enforcer -- a .45 caliber pistol -- and that González once handed him such a weapon.

At the close of the government's case the Defendants moved for judgment of acquittal under Fed. R. Crim. P. 29. The motions were denied. At the end of trial, the Defendants unsuccessfully renewed their requests, and on March 3, 2008, they were found guilty. Subsequent Rule 29 motions by the Defendants were also denied.

On October 10, 2008, Rivera was sentenced to life imprisonment, with five years of supervised release if ever released from confinement. On November 10, 2008, González was sentenced to a term of imprisonment of two hundred forty months, or twenty years, followed by a term of supervised release of ten years. All remaining counts were dismissed against both defendants. This timely appeal followed.

## II. Discussion

Rivera argues that the district court erred by (1) excluding evidence of certain prior statements made by Barreira, the government's main witness against him, regarding the weapon

seized during Barreira's arrest; (2) allowing a conviction based on evidence that established an impermissible variance to the charges listed in the indictment against him; and (3) permitting the government to introduce evidence of the Torres murder via co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). González, on the other hand, claims that (1) the evidence against him was insufficient to sustain his conviction, and (2) the district court erred in applying an enhancement to his sentence based on a prior conviction. We address each issue in turn.

## A. Rivera's Challenges on Appeal

### 1. Exclusion of Barreira's Prior Statements

Rivera claims that the district court improperly denied the introduction of extrinsic impeachment evidence in the cross-examination of government witness Barreira and that this violated his constitutional right to confront the witness against him. Rivera sought to impeach Barreira with a sworn affidavit given to state prosecutors upon his arrest. The affidavit contained Barreira's sworn assertions that the gun that was confiscated from him on the day of his arrest -- the .357 Magnum that he had taken from Chito -- was the same gun used for the drive-by shooting and, consequently, the murder of Torres.[5] Subsequent ballistic evidence

---

[5] Rivera also sought to admit certain certified translations of audio recordings of testimony given by Barreira in state court proceedings. Counsel for Rivera admittedly failed to submit the transcripts to the court below as rejected impeachment material for the record, and Rivera's briefing on appeal is bereft of any

revealed, however, that the confiscated .357 Magnum was not a match for the one used in the murder. Accordingly, Barreira's testimony at trial acknowledged that he had "made a mistake" in his earlier statements "by incorrectly assuming that [the .357 Magnum] was the revolver that was used" in the Torres murder. Barreira stated that he had made this assumption "because [] the day that [he] asked Chito to give [him] the revolver was the same day that Valdo ordered [him] to take the revolver from Chito" in connection with the botched drive-by.

Rivera argues that Barreira's prior sworn statements establish a discrepancy regarding the gun that makes his testimony at trial less credible, and his prior statements more significant for impeachment purposes. We disagree.

"The Confrontation Clause of the Sixth Amendment secures a right to cross-examination in order to test 'the believability of a witness and the truth of his testimony.'" United States v. González-Vázquez, 219 F.3d 37, 45 (1st Cir. 2000) (quoting United States v. Carty, 993 F.2d 1005, 1009 (1st Cir. 1993)). However, as we have explained, this right is not unlimited. "When a witness's credibility is at issue, the trial court may limit cross-examination as long as the court allows 'sufficient leeway to

---

description whatsoever of what, if any, material statements those transcripts contain. We nonetheless assume, based on the nature of Rivera's argument on appeal, that they contain parallel misstatements by Barreira as to the gun in question and would therefore have a similar effect upon the question on appeal.

establish a reasonably complete picture of the witness' veracity, bias, and motivation.'" Id. (quoting United States v. Laboy-Delgado, 84 F.3d 22, 28 (1st Cir. 1996) (internal quotation marks omitted)).

Thus, on appeal from a trial court's decision to impose such limitations, we first "review the record de novo to ascertain whether the court, overall, gave the defendant a reasonable chance to develop the whole picture." Laboy-Delgado, 84 F.3d at 28 (emphasis added). "If we determine that the defendant's opportunity to impeach adverse witnesses met or exceeded this constitutionally-guaranteed threshold, we review for abuse of discretion the district court's decision to impose reasonable limits on cross-examination in order to avoid confusion of the issues or extended discussion of marginally relevant material." United States v. Byrne, 435 F.3d 16, 21 (1st Cir. 2006) (internal quotation marks and citation omitted).

Barreira's testimony at trial acknowledged that he had made a prior statement in which he had mistakenly characterized the confiscated revolver as the murder weapon. Barreira's acknowledgment at trial of the discrepancy between his prior statement and the subsequently-gleaned ballistics information clarified to the jury the precise conflict that Rivera was interested in highlighting through the affidavit. The district court's failure to allow Rivera to introduce Barreira's prior sworn

-11-

statement as extrinsic evidence therefore did not prevent the jury from obtaining "a reasonably complete picture of the witness' veracity, bias, and motivation." Laboy-Delgado, 84 F.3d at 28 (quoting United States v. Boylan, 898 F.2d 230, 254 (1st Cir. 1990)). Defense counsel had ample opportunity to explore this avenue of impeachment and to "ensure[] that the jury understood [Rivera's] concerns about the witness," at which point "the district court was entitled to move the trial forward." Byrne, 435 F.3d at 22. See United States v. Innamorati, 996 F.2d 456, 478 (1st Cir. 1993) (noting "no Confrontation Clause issue [was] presented" where "reasonable opportunity to test [the witnesses'] veracity and motives was offered"). We therefore hold that the district court did not deprive Rivera of his confrontation rights by denying his request to admit prior statements by Barreira as impeachment material.

Moreover, we conclude that the district court's decision was not an abuse of discretion. While the previous statement might be superficially inconsistent with Barreira's testimony at trial, his explanation upon questioning by both parties, i.e., mistaken belief, did away with the inconsistency; and so the trial court found. See United States v. Martin, 694 F.2d 885, 888 (1st Cir. 1982) (alleged inconsistent statement of witness made prior to trial not allowed as extrinsic impeachment evidence where defendant-appellant was unable to demonstrate that the offered

-12-

testimony was in fact inconsistent with statements made at trial); see also United States v. Hale, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness. As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent.").

### 2. Prejudicial Variance

Rivera next argues that the government's evidence at trial established an impermissible variance from the charges listed in the indictment against him.  Specifically, he submits that any facts pertaining to drug trafficking in the area of Quebrada del Agua, introduced through Barreira's testimony, are outside of the charged conspiracy and are, in fact, related to a separate conspiracy led by Valdo and an individual known as "Lipo."  Rivera bases this contention on testimony at trial to the effect that Lipo was running the drug point at Quebrada del Agua, which distributed marijuana to the adjacent town of Peñuelas, and that this drug point was not "owned" by Martínez, nor did Lipo "work for" him.  Rivera particularly emphasizes the fact that neither Quebrada del Agua nor Peñuelas were mentioned in the indictment.[6]

---

[6] The district court denied Rivera's motion in limine in this regard and his direct objection to Barreira's Quebrada del Agua testimony; it also denied Rivera's subsequent motion for a mistrial during the cross-examination of Barreira based on the same argument.  The argument was again raised in Rivera's various Rule 29 motions, which were also denied.

Rivera's claim "requires us to determine whether a variance occurred and, if so, whether that variance prejudiced [his] substantial rights."[7]  See United States v. Pérez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003).  This doctrine is also meant to protect against the prejudicial "spillover" effect that may occur in cases involving multiple defendants.  See United States v. Tormos-Vega, 959 F.2d 1103, 1115 (1st Cir. 1992); United States v. Flaherty, 668 F.2d 566, 582 (1st Cir. 1981) ("If the Government proves more conspiracies than the one charged in the indictment, a defendant involved in one conspiracy may not be convicted on the basis of evidence that relates only to a separate conspiracy.").  It is this last claim that Rivera attempts to raise on appeal.

When, as here, a defendant asserts a claim of variance that is "premised on the notion that multiple conspiracies existed and that his activities were not part of the charged conspiracy, the initial question . . . is one of evidentiary sufficiency." Pérez-Ruiz, 353 F.3d at 7.  We must first determine whether the government was able to prove the conspiracy charged in the indictment by applying the typical framework for the review of sufficiency challenges in criminal cases.  See id.  Accordingly, "we canvass the evidence (direct and circumstantial) in the light

---

[7]  Our review in this sense is de novo.  See United States v. Dellosantos, 649 F.3d 109, 124 (1st Cir. 2011) ("We review de novo the question whether a variance affected a defendant's substantial rights." (quoting United States v. Wihbey, 75 F.3d 761, 774 (1st Cir. 1996)) (emphasis added).

most agreeable to the prosecution" to assess if the evidence, "including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." Id. (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997)) (internal quotation marks omitted). In doing so, we resolve all credibility issues in favor of the verdict, and "[w]e must reject [Rivera's] claim as long as a plausible reading of the record supports the jury's implied finding that he knowingly participated in the charged conspiracy." Id. (citing United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000) and United States v. Sepúlveda, 15 F.3d 1161, 1173 (1st Cir. 1993)).[8]

---

[8] Thus, we are required to address the issue of variance only if we find that the evidence establishes agreements different from those charged. United States v. Soto-Beníquez, 356 F.3d 1, 18 n.1 (1st Cir. 2004). See Wihbey, 75 F.3d at 773 (explaining the framework for analyzing when a variance between the conspiracy charged and the conspiracy proven constitutes reversible error). That phase of the inquiry focuses on whether there is sufficient evidence to permit a well-instructed jury to convict the defendant of a similar related conspiracy, and if so, whether the variance between the two conspiracies affected his or her substantial rights. See United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987); Wihbey, 75 F.3d at 773 ("Put differently, '[s]o long as the statutory violation remains the same, the jury can convict even if the facts are somewhat different than charged -- so long as the difference does not cause unfair prejudice.'") (quoting United States v. Twitty, 72 F.3d 228, 230 (1st Cir. 1995)). Because we find that the evidence in this case was sufficient to support the finding of a single conspiracy, however, we need not reach these additional steps in our analysis. See, e.g., Soto-Beníquez, 356 F.3d at 18 n.1; Pérez-Ruiz, 353 F.3d at 7.

In order to determine whether a single conspiracy was proved by the government, we look at the totality of the evidence with various factors in mind, "none of which, standing alone, i[s] necessarily determinative." United States v. Sánchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008). These factors include "(1) the existence of a common purpose, . . . (2) the interdependency of various elements in the plan, . . . and (3) the degree of overlap among the participants." Soto-Beníquez, 356 F.3d at 18-19. The government does not need to prove "that each conspirator knew of or had contact with all other members," nor "that the conspirators knew all of the details of the conspiracy or participated in every act in furtherance of the conspiracy." Id. at 19 (citing United States v. Mena-Robles, 4 F.3d 1026, 1032 (1st Cir. 1993)). Here, in order to find the single conspiracy charged, with Martínez at its head, it must have been possible for the jury to "infer from the acts and statements of the witnesses a single ongoing 'agreement' that embraced [Rivera] and other co-conspirators." United States v. Jones, 674 F.3d 88, 92 (1st Cir. 2012).

Rivera concedes that the trial evidence is sufficient to support an overlapping of participants between Martínez's operation and the Quebrada del Agua operation, particularly as it relates to Valdo. His concern instead is that the objective of the Quebrada del Agua drug point owned by Lipo was different and separate from any of the charged conspiracy's concerns because it focused on

selling marijuana in neighboring Peñuelas (an area not specifically mentioned in the indictment) and the evidence reflects that Lipo did not "work for" Martínez. Given, however, "the wide breadth of the 'common goal' requirement," Rivera's argument does not take him far. See Sánchez-Badillo, 540 F.3d at 29 (citing United States v. Portela, 167 F.3d 687, 695 n.3 (1st Cir. 1999)); see also United States v. Mangual-Santiago, 562 F.3d 411, 421-22 (1st Cir. 2009) (noting that "'goal of selling cocaine for profit' or 'furthering the distribution of cocaine is . . . sufficient evidence' of a common goal" (quoting Portela, 167 F.3d at 695)).

The evidence shows that the activities that took place at Quebrada del Agua were in fact linked to Martínez's operation. Barreira testified that Valdo was in charge of distributing Martínez's cocaine and that, while he was still an enforcer for Martínez's operation, "[Barreira] left the heroin point to go help Valdo with the cocaine kilos at [] Quebrada del Agua." Fairly read, Barreira's testimony reflects that, while Lipo's marijuana distribution operation ran separately from Martínez's, Valdo ran his cocaine laboratory from the Quebrada del Agua residence owned by Lipo's sister, where he kept a "press" for packaging the kilos of cocaine. Barreira also indicated that, although he personally "would not get [any] profits out of [Lipo's marijuana operation], [] [he] would provide safety and security for the marijuana . . . stash[ed] at the house."

-17-

We also note that another of the government's witnesses, an unindicted co-conspirator named Gerardo Fontánez ("Fontánez"), testified that he saw Rivera working the marijuana, crack, and cocaine processing table with both Lipo and Valdo. Fontánez testified that he was residing in the same house in Quebrada del Agua when these events took place. In testimony that will also become relevant in our subsequent analysis, Fontánez indicated that on one occasion he saw Lipo take a gun from Rivera and another from Chito around the time of the Torres murder.[9]

The evidence, therefore, could support a rational inference that, at the very least, Lipo's drug point shared a common defense with the Martínez operation and that Martínez's cocaine supply depended, at least in part, upon Valdo's successful processing of the substance at the Quebrada del Agua residence. See Soto-Beníquez, 356 F.3d at 19 (indicating that interdependency can be shown where "the success of an individual's own drug transactions depends on the health and success of the drug trafficking network that supplies him"); Portela, 167 F.3d at 695 ("Establishing interdependence among the participants requires determining whether the activities of one aspect of the scheme are

_____

[9]     Rivera challenges Fontánez's testimony as having been inconsistent and "incredible," but it is the prerogative of the jury to give credence to and interpret the combined testimony of the various government witnesses and draw any reasonable conclusions from the same. See United States v. Cianci, 378 F.3d 71, 92 (1st Cir. 2004) (indicating credibility of witnesses "is the sole function of the trier of fact").

-18-

necessary or advantageous to the success of another aspect of the scheme." (internal quotation marks and citation omitted)). "Such interdependence 'makes it reasonable to speak of a tacit understanding between [a core conspirator] and others upon whose unlawful acts' his success depends." Sánchez-Badillo, 540 F.3d at 29 (quoting Glenn, 828 F.2d at 858).

Because the jury reasonably could have concluded that the Quebrada del Agua activities shared a common purpose with Martínez's operation, had the requisite degree of interdependency, and were thus a subset of Martínez's master conspiracy, we must reject Rivera's argument that there was a variance in this regard. See United States v. LiCausi, 167 F.3d 36, 45 (1st Cir. 1999) ("Whether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury."); see also United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999) (stating that "[j]urors are entitled to draw reasonable inferences from proven facts").

As we stated before, "not every difference between the indictment and the proof justifies relief." United States v. Marrero-Ortiz, 160 F.3d 768, 773 (1st Cir. 1998). Although Quebrada del Agua and Peñuelas are not specifically listed in the indictment, "[t]he government need not recite all its evidence in the indictment, nor is its trial proof limited to the overt acts specified therein." Id. It was established at trial that Quebrada

del Agua is located in Ponce, and the indictment mentioned that the drug points associated with the conspiracy were "located in Ponce, Puerto Rico." In addition, aside from overt act #27, discussed further infra, Rivera was generally charged as a drug point owner, drug processor, and as an enforcer for the conspiracy. To this end, the indictment specified that Martínez's subordinates were tasked, inter alia, with "accompanying him to purchase kilograms of narcotics in Ponce and San Juan, Puerto Rico, and other locations for further distribution at the drug points," as well as concealing drugs at their residences. Although the indictment did not spell out every single location at which activities related to the conspiracy took place, it gave a sufficient description of the manner and means of the same to put Rivera on notice of the charges against him. See, e.g., Innamorati, 996 F.2d at 477-78 (rejecting claim of variance because, although certain evidence presented encompassed acts not listed in the indictment, "[t]he evidence complained of [] f[ell] squarely within the scope of th[e] alleged conspiracy, both temporally and substantively"). We find that Rivera "cannot credibly claim surprise" and, therefore, "the asserted variance does not warrant setting aside the verdict." Marrero-Ortiz, 160 F.3d at 773.

### 3. Admission of Co-Conspirator Statements

Rivera's final challenge to his conviction is another attack on the district court's evidentiary rulings. He contends

that any statements made by Chito or Valdo to Barreira in relation to the murder of Torres -- overt act #27 -- were inadmissible hearsay. Because Rivera preserved his challenge to the district court's admission of these statements,[10] we review his claim for abuse of discretion. United States v. Díaz, 670 F.3d 332, 348 (1st Cir. 2012).

Federal Rule of Evidence 801(d)(2)(E) classifies as non-hearsay statements made by a defendant's co-conspirators "during and in furtherance of the conspiracy." As such, these statements "if admitted, may be considered for the truth of the matter asserted." United States v. Colón-Díaz, 521 F.3d 29, 35 (1st Cir. 2008). Their admissibility turns on four elements: (1) the existence of a conspiracy, (2) the defendant's membership in that conspiracy, (3) the declarant's membership in the same conspiracy, and (4) that the statement be made in furtherance of the conspiracy. Id. at 35-36. "A district court faced with a challenge to the admission of a co-conspirator's statement must provisionally admit the statement and then wait until the end of the trial to consider whether, in light of all the evidence, [these] four conditions are satisfied by a preponderance of the evidence." Díaz, 670 F.3d at 348 (citing United States v.

---

[10] During trial, the district court denied Rivera's motion in limine requesting that it exclude evidence in relation to overt act #27 and Rivera presented an overruled objection in this respect during Barreira's direct testimony.

-21-

Vázquez-Botet, 532 F.3d 37, 62 (1st Cir. 2008) and United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977)).  The preponderance of the evidence required in this context "must necessarily comprise more than the weight of the statement itself," requiring some corroborating extrinsic evidence.  Portela, 167 F.3d at 703 (quoting Sepúlveda, 15 F.3d at 1181-82).

Rivera contends that the following statements are inadmissible because they were not made in furtherance of the conspiracy: (1) Chito's confession to Barreira about the murder of Torres and his reasons for committing the same, i.e., that the target had stolen five kilos of cocaine from Valdo, and (2) Valdo's statements to Barreira in reaction to the news of the botched drive-by, i.e., his irritation and instruction that Barreira confiscate Chito's weapon.  We find there was no error as to the latter of these statements because Barreira's testimony regarding Valdo's reaction was not hearsay.  The government offered Valdo's out-of-court statements to establish the role that Valdo played as supervisor over both Chito and Rivera.  In addition, we have noted that "[o]ut-of-court statements providing directions from one individual to another do not constitute hearsay."  Díaz, 670 F.3d at 346 (citing United States v. Bailey, 270 F.3d 83, 87 (1st Cir. 2001)).  We therefore proceed to assess only the admissibility of Chito's statements to Barreira.

Rivera's argument here essentially reasserts his variance claim. Because Barreira's conversation with Chito and Rivera about the botched drive-by took place at Quebrada del Agua, and none of the activities at Quebrada del Agua had to do with the charged conspiracy, so Rivera's argument goes, Chito's statements were inadmissible. Having dismissed Rivera's premise by finding that the government in this case was able to prove that a single conspiracy existed, we need not delve too deeply in assessing this claim.

The first two elements of the test outlined above are met. We have already discussed the government's evidence from which a reasonable juror could have concluded that a conspiracy to distribute drugs operated under Martínez's leadership in the area of Ponce, that the Quebrada del Agua operation was part and parcel of the same drug ring, and that Rivera was a member of the conspiracy by virtue, inter alia, of his drug processing activities. As to the third element -- whether Chito, the declarant, was also a member of the conspiracy -- there is evidence on the record, aside from Barreira's own testimony, that Chito was a runner for the group, that he was seen arriving at Quebrada del Agua in the company of Rivera, that the two of them were seen meeting with Lipo, and that the latter then took a gun from Rivera and another from Chito. This testimony was given by government witness Fontánez and serves as independent corroboration of the

-23-

fact that Chito was an active member of the charged conspiracy. See, e.g., Díaz, 670 F.3d at 348 (identification by other witnesses of the declarants as co-owners of the drug point and related testimony as to their activity there considered sufficient as evidence other than the out-of-court statements at issue).

Finally, the fourth element is satisfied because Chito's statement to Barreira, that he and Rivera had performed a (botched) drive-by in retaliation for the theft of cocaine from Valdo's stash, pertained to the defense of Martínez's drug trafficking ring. See United States v. Rodríguez, 525 F.3d 85, 101 (1st Cir. 2008) ("A statement is in furtherance of the conspiracy if it tends to advance the objects of the conspiracy as opposed to thwarting its purpose." (internal quotation marks and citation omitted)). At the very least, the district court could reasonably have determined that the conversation between Barreira, Chito, and Rivera about the murder of Torres served to keep the members of the conspiracy up-to-date on important developments relating to the organization. See Sepúlveda, 15 F.3d at 1180 (noting as "common ground -- and common sense -- that the reporting of significant events by one coconspirator to another advances the conspiracy"); see also United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983) ("Statements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy

-24-

and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met."). Thus, the district court did not err when it admitted the co-conspirator statements at issue.[11]

We move on to consider González's claims on appeal.

## B. González's Challenges on Appeal

### 1. Sufficiency of the Evidence

González contends that the district court erred in denying his Rule 29 motions for judgment of acquittal based on the insufficiency of the evidence against him. He argues that the government's evidence was insufficient to sustain his conviction because the witnesses' testimonies were "uncorroborated," "insubstantial," and "incredible." We find otherwise.

---

[11] Rivera contends that the same evidence does not pass muster under Crawford v. Washington, 541 U.S. 36 (2004) (holding that Confrontation Clause bars admission of testimonial hearsay unless declarant is unavailable and accused had opportunity to cross-examine). The claim is without merit because "[s]tatements made during and in furtherance of a conspiracy are not testimonial" and are, therefore, not subject to Sixth Amendment concerns. United States v. Malpica-García, 489 F.3d 393, 397 (1st Cir. 2007) (citing Crawford, 541 U.S. at 56); see also United States v. Hansen, 434 F.3d 92, 100 (1st Cir. 2006) (rejecting Crawford challenge and finding that statements at issue were nontestimonial because they were either co-conspirator statements made in furtherance of the conspiracy, or casual remarks not reasonably expected to be available for use at a later trial).

We also reject Rivera's additional, overall assertion that the multiple evidentiary errors he argued, together, caused him prejudice. Since we rejected all of Rivera's claims of error, "it necessarily follows that [his] trial was not tainted by cumulative error and reversal is not warranted." United States v. Brown, 669 F.3d 10, 28 (1st Cir. 2012).

Because González moved for a judgment of acquittal on sufficiency grounds, we review the district court's denial of the motion de novo. United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009). As noted earlier, we review the sufficiency of the government's evidence by examining both the direct and circumstantial proof, "in the light most favorable to the jury's verdict," id., to determine "'whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime,'" id. (quoting United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008)). To establish that the defendant is guilty of participating in a drug-trafficking conspiracy, "the government must prove . . . that 'an agreement existed to commit the underlying offense, and that the defendant elected to join the agreement, intending that the underlying substantive offense be committed.'" United States v. Paret-Ruiz, 567 F.3d 1, 5 (1st Cir. 2009) (quoting United States v. Gómez-Rosario, 418 F.3d 90, 105 (1st Cir. 2005)). To prove the underlying offense of "possession with intent to distribute, the government must show that the defendants knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute." United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir.

2007).  Based on the totality of the evidence, we find that this standard is met in the case before us.

The government's case against González was mainly based on the testimonies of Barreira and Rentas.  Rentas, who described himself as a drug user from La Ferrán Ward, told members of the jury that he was a drug seller who also worked as a lookout and runner for the drug trafficking organization run by Martínez.  He stated that he agreed to testify pursuant to a plea and cooperation agreement.  Rentas described the role of "enforcers" in the organization and identified González as an armed enforcer of the same.  He testified that he specifically remembered González arriving at the drug point, armed, and in the presence of another charged co-conspirator.  Barreira, in turn, identified himself as a drug user and an admitted murderer, and told members of the jury that, aside from working as an enforcer, he had worked as a runner, seller, and processor of drugs within the organization.  His testimony corroborated Rentas's account of what an enforcer's role was within the organization, pegged González as one, specified the kind of weapon that González typically carried, and indicated that González once handed him such a weapon.  Barreira also testified that he saw González receive cocaine from co-conspirator Rodríguez during the time frame of the conspiracy, and that González once requested heroin from Barreira himself for distribution in the

Ponce Housing Project.  Barreira's testimony in this regard was corroborated by Vidal, another government witness.

This evidence is sufficient to support the jury's reasonable conclusion that González was in fact an enforcer for Martínez's organization and that he also participated as a distributor of both cocaine and heroin in furtherance of the charged conspiracy.  In the past, similar evidence has been found sufficient to sustain a drug-related conspiracy conviction.  See, e.g., United States v. Rivera-Rodríguez, 617 F.3d 581, 599-600 (1st Cir. 2010) (concluding testimonial evidence sufficient for jury to find that defendant participated in drug-trafficking conspiracy where testimony related to defendant's relationships with drug traffickers and his drug-supplying activities); United States v. Rodríquez–Lozada, 558 F.3d 29, 39 (1st Cir. 2009) (same).  We have also found that evidence of even a single drug transaction, under circumstances that reflect the defendant's tacit agreement relating to the continuing drug-trafficking enterprise, can be sufficient to sustain a conviction for conspiracy to distribute narcotics.  See United States v. Rivera-Ruiz, 244 F.3d 263, 269 (1st Cir. 2001) (agreeing with this proposition and citing cases).  Here, testimony that González accepted drugs from Rodríguez for distribution, asked Barreira for additional drugs also for distribution, carried a weapon, and was a known enforcer for the operation who carried out his patrolling duties in the company of other charged co-

conspirators, are all facts supportive of the jury's determination that González was a member of the overall drug trafficking scheme. See Paret-Ruiz, 567 F.3d at 6 ("An agreement between coconspirators may be proven by circumstantial evidence, and it may be tacit."); United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992) ("[A]n agreement . . . may be inferred from a development and collocation of circumstances.") (quoting United States v. Smith, 680 F.2d 255, 259 (1st Cir. 1982) (internal quotation marks omitted).

González contends that the government could not rest its case on the testimony of a government cooperator and serial killer (Barreira) and the minimal and inconsistent corroboration provided by Rentas, who was also a government cooperator and Barreira's brother.[12] As to Rentas, González points to his initial inability to list González as one of the enforcers for the organization, and emphasizes that he was only able to identify González as an enforcer after the government's repeated questioning. As to

---

[12] It is unclear from González's brief what significance we are asked to draw from the fact that the two witnesses were brothers, except perhaps the notion that they would be in cahoots to coordinate their respective testimonies in a bid to enhance their value to the government as witnesses. No such argument is articulated by González, however, and, in any event, this concern would be one for the jury to weigh as part of its credibility determination. Cf. United States v. Vázquez-Guadalupe, 407 F.3d 492, 499 (1st Cir. 2005) (deeming testimony of a government witness, a criminal defendant being paid by the government for his cooperation, admissible and noting the credibility of that testimony "is left for the jury").

Barreira's testimony, González only contends that the same was stereotyped, general, and vague.

We cannot agree with González that such alleged deficiencies in the testimonial evidence presented are enough to render the basis for his conviction insubstantial under the law. In conducting our sufficiency analysis, we are not called to "'assess the credibility of a witness, as that is a role reserved for the jury.'" Rivera-Rodríguez, 617 F.3d at 596 n.6 (quoting Troy, 583 F.3d at 24); see also United States v. Calderón, 77 F.3d 6, 10 (1st Cir. 1996) ("It [is] well within the jury's province for it to choose to believe the testimony of [the defendant's] accomplices -- in the face of cross-examination of their characters and motives -- and to disbelieve [the defendant's] version of the story."). Furthermore, "the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible." United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000) (citing United States v. Rosario–Díaz, 202 F.3d 54, 67 (1st Cir. 2000)). We do not agree that the testimonies of Barreira and Rentas were facially incredible and, in fact, their testimonies, in combination with the testimony of Vidal, corroborated each other.

Having rejected González's challenge to the sufficiency of the evidence to sustain his conviction, we now consider his argument against the district court's sentencing determination.

## 2. Sentencing Enhancement

González challenges the applicability to his case of the sentencing enhancement provided for in 21 U.S.C. § 841(b)(1)(A), which allows a higher penalty for repeat drug offenders whose prior convictions have become final. The provision states, in pertinent part, that any person who violates subsection (a) of Section 841 "shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life," except that "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment . . . ." 21 U.S.C. § 841(b)(1)(A) (emphasis added). Prior to trial, the government filed an informational notice under 21 U.S.C. § 851(a)(1)[13] to establish González's prior conviction under the laws of Puerto Rico for a felony drug offense, that is, possession of a measurable amount of cocaine in violation of Section 404 of the Commonwealth of Puerto Rico's Controlled Substances Law. After trial and the jury's finding of guilt under 21 U.S.C. §§ 841(a)(1) and 846, González moved to strike the government's informational notice, but the district court denied

---

[13] This provision requires that the government provide pre-trial notice to a defendant of any previous convictions based upon which he or she might be sentenced to increased punishment for a conviction under the Controlled Substances Act. See Comprehensive Drug Abuse Prevention and Control Act of 1970, § 411(a)(1), 21 U.S.C. § 851(a)(1).

the request in a written order and González was sentenced pursuant to the enhanced penalty.

On appeal, González reiterates the argument he made below, that the district court should not have applied the enhanced penalty provision based on the prior conviction because the same was not yet "final," as required by Section 841(b)(1)(A), at the time of his arrest or the issuance of the indictment in the federal case. He requests that we set aside his sentence and remand his case to the district court for re-sentencing. "As this argument presents a question of statutory interpretation, we review it de novo." United States v. Lino, 493 F.3d 41, 43 (1st Cir. 2007) (emphasis added); see also Rivera-Rodríguez, 617 F.3d at 608 ("We review de novo questions of the proper interpretation of statutes, including whether prior convictions count for purposes of 21 U.S.C. § 851."). For the reasons that follow, we affirm the district court's determination.

The following facts are relevant to González's sentencing appeal. On or about June 20, 2003 -- during the time frame and within the territorial limits of the conspiracy charged -- González was arrested in possession of a measurable amount of cocaine in violation of Puerto Rico's drug laws.[14] On or about September 23,

---

[14] This drug arrest was included as an overt act in the indictment in this case and the underlying evidence was duly produced by the government to the defense as part of its discovery obligations. For reasons not revealed in the record before us, however, the government did not introduce evidence of this incident at trial,

2003, pursuant to Rule 247.1 of the Puerto Rico Rules of Criminal Procedure, P.R. Laws Ann. tit. 34 App. II, R. 247.1, and the provisions of the state diversionary disposition program known as "T.A.S.C.," González was placed on a probationary term of two years for the referenced state drug arrest.[15] On or about March 31, 2005, González was put behind bars in the local system for events unrelated to this case. In May of 2005, González was arrested pursuant to the federal charges presently before us, and on December 1, 2005, he was indicted. Five months later, on or about May 2, 2006, the Superior Court of Puerto Rico held a hearing and revoked González's probationary term. The Superior Court then entered a judgment of guilty for the charged offense, and sentenced González to a two-year term of imprisonment.

González argues that pursuant to our holding in Lino, "[a] prior drug conviction" that was based on one of the transactions that comprises the ongoing, overarching conspiracy at issue in the federal trial cannot "constitute[] a 'distinct criminal episode' sufficient to trigger [the Section 841(b)]

_____

nor did it call the arresting officer to the stand.

[15] This procedure allows the state court to place a defendant on probation for the charged drug offense without entering a judgment of guilt, subject to the revocation of the term of probation (and the pronouncement of judgment) in the event that any of its conditions are violated. P.R. Laws Ann. tit. 34 App. II, R. 247.1. Otherwise, the court, at its discretion, may exonerate the person and dismiss the charges against him at any time during the period of probation. Id.

enhancement" unless "the defendant continued to participate in drug activity after the conviction became final." 493 F.3d at 43 (quoting United States v. De Jesús Mateo, 373 F.3d 70, 74 (1st Cir. 2004)). González posits that a prior conviction in this sense is not final for purposes of a Section 841(b) enhancement until the time for taking a direct appeal on the same has expired. He so concludes by citing to United States v. Campbell, 980 F.2d 245 (4th Cir. 1992), wherein, he contends, the Fourth Circuit so held. Thus, González argues it was not until thirty days after the Superior Court of Puerto Rico revoked his probationary period and entered a finding of guilt against González, in May of 2006, that his state conviction became final for Section 841(b) purposes. See P.R. Laws Ann. tit. 34 App. II, R. 193 (providing that the jurisdictional term for filing a direct appeal from a conviction to the Puerto Rico Circuit Court of Appeals is "thirty (30) days after judgment is rendered"). In sum, González contends that his state conviction did not become final until approximately one year after his arrest in the present case, which renders the Section 841(b) enhancement inapplicable.

González's reasoning is flawed for the following reasons. First, whether or not a prior criminal episode constitutes a "conviction" for purposes of a federal statutory scheme is determined under "federal -- not state -- law." Rivera-Rodríguez, 617 F.3d at 609; see also id. ("The Supreme Court and our circuit

-34-

indicate that federal law and not . . . Puerto Rico Rule of Criminal Procedure 247.1 determines whether [prior drug arrests that resulted in probationary terms] constitute prior convictions under 21 U.S.C. § 851."). Second, the Fourth Circuit's decision in Campbell does not stand for the holding that González ascribes to it. In that case, the Fourth Circuit held that the trial court had not erred in enhancing the defendant's sentence pursuant to Section 841 as a result of a "prior conviction," where the defendant had been sentenced (under a similar Virginia drug diversionary program and statute) to a term of supervised probation without the imposition of a judgment of guilt prior to the offense date charged in the federal indictment. 980 F.2d at 249-50.

In circumstances that parallel the case at hand, the defendant in Campbell violated his probation and the state court revoked the deferral and entered a final state conviction on a date after the indictment issued in his federal case, but prior to Campbell's federal trial and sentencing. The Fourth Circuit determined that "[a] sentence of probation, though subject to expunction, constitutes a 'prior sentence' for purposes of sentence enhancement," since "[t]he possibility of later 'expunction under state law does not alter the historical fact of the conviction.'" Id. at 251 (quoting Dickerson v. New Banner Inst., Inc., 460 U.S.

103, 115 (1983)).[16]  Thus, Campbell holds that "as a matter of federal law" a defendant's "deferred sentence under [] state law constitutes a prior conviction for purposes of section 841."  Id.

Our more recent decision in Rivera-Rodríguez addressed precisely the issue in controversy here and resulted in the same conclusion as reached by the Fourth Circuit (and the court below in this case) based on the same case law cited in Campbell.  One of the defendants in the Rivera-Rodríguez appeal had been exposed to the enhanced sentence provision of Section 841(b)(1)(A) based on a prior sentence of probation and rehabilitation for the possession of narcotics, pursuant to Puerto Rico Rule of Criminal Procedure 247.1.  617 F.3d at 609.  This defendant argued that the state sentence of probation could not be considered a prior conviction because (1) "no appeal could have been taken" from the imposition of probation in the absence of a finding of guilt, (2) his record was thereafter expunged by the Puerto Rico Superior Court, and (3)

---

[16]  In Dickerson, the Supreme Court had to decide the question "whether firearms disabilities imposed by 18 U.S.C. §§ 922(g) and (h) apply with respect to a person who pleads guilty to a state offense punishable by imprisonment for more than one year, when the record of the proceeding subsequently is expunged under state procedure following a successfully-served term of probation."  460 U.S. at 105.  The Court held that the statutory disabilities applied, reasoning that although "there was no written adjudication of guilt and there was no formal pronouncement of a sentence of imprisonment for a specified term . . . [i]t was plainly irrelevant to Congress whether the individual in question actually receives a prison term . . . . [O]ne cannot be placed on probation if the court does not deem him to be guilty of a crime . . . ."  Id. at 113-14.

Puerto Rico Rule of Procedure 247.1 explicitly states that the sentence of probation "shall not be deemed as a conviction." Id. Citing to both Dickerson and our decision in United States v. Bustamante, 706 F.2d 13, 14 (1st Cir. 1983), we first concluded that federal and not state law decided the question. Rivera-Rodríguez, 617 F.3d at 609. We then went on to hold that the defendant's prior incidents constituted "convictions" for purposes of 21 U.S.C. § 851, and agreed with our sister circuits of appeals who "ha[d] considered this § 841 question" and "counted prior felony drug convictions even where those convictions had been set aside, expunged, or otherwise removed from a defendant's record" for "policy reasons unrelated to innocence or an error of law." Id. at 609-10 (quoting United States v. Law, 528 F.3d 888, 911 (D.C. Cir. 2008) (citing cases from the Second, Third, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits).

Here, González cannot even claim that his prior sentence of probation should not be counted because it was expunged from his record. Rather, the Puerto Rico Superior Court sentenced González to a term of probation (without an adjudication of guilt) prior to the date on which the federal indictment was returned, but later revoked it, entering a final order of conviction based on González's inability to refrain from criminal conduct thereafter. This confirms the notion that the offense date charged in González's federal indictment included criminal conduct occurring

both before and <u>after</u> the Puerto Rico sentence of probation was entered. Regardless of subsequent events, however, our case law requires that we consider the state court's imposition of a sentence of probation for the drug felony charged against González as a "prior conviction" for purposes of the Section 841 enhancement, whether or not it was subsequently revoked. Therefore, the district court properly applied the sentence enhancement in question.

### III. <u>Conclusion</u>

We conclude that the district court did not deprive Rivera of his confrontation rights by denying his request to admit prior statements by government witness Barreira as impeachment material, nor did the district court commit an abuse of discretion by not allowing this evidence. We further conclude that the government's proof at trial did not establish an impermissible variance that would warrant reversal of Rivera's conviction. Moreover, there was sufficient evidence adduced at trial to convict both Rivera and González of the single conspiracy charged in the indictment. Finally, the district court did not err with respect to the sentencing claim made by González. Accordingly, the judgment of the district court as to each of the Defendants is affirmed.

**<u>Affirmed</u>.**